# UNITED STATES *v.* WESTERN PACIFIC RAILROAD CO. ET AL.

No. 18.   Argued October 15, 1956.—Decided December 3, 1956.

60

*Morton Hollander* argued the cause for the United States. With him on the brief were *Solicitor General Rankin, Assistant Attorney General Doub, Ralph S. Spritzer* and *Melvin Richter*.

*Frederick Bernays Wiener* argued the cause for respondents. With him on the brief was *Lawrence Cake*.

MR. JUSTICE HARLAN delivered the opinion of the Court.

The three respondent railroads each sued in the Court of Claims to recover from the United States as shipper the difference between the tariff rates actually paid and those allegedly due on 211 Army shipments of steel aerial bomb cases filled with napalm gel.[1] Approximately 200 of the shipments were made over the lines of respondents Bangor and Seaboard in 1944; the remainder were carried by respondent Western Pacific in 1948 and 1950.

Napalm gel is gasoline which has been thickened by the addition of aluminum soap powder. The mixture is inflammable but not self-igniting. In a completed incendiary bomb the napalm gel is ignited by white phosphorus contained in a burster charge, which in turn is fired by a fuse. These shipments, however, involved only the steel casings and the napalm gel; burster and fuse had not yet been added.

The carriers billed the Government at the high first-class rates established in Item 1820 of Consolidated Freight Classification No. 17 for "incendiary bombs." Pursuant to § 322 of the Transportation Act of 1940,[2] the

---

[1] The suits were brought under the Tucker Act, 28 U. S. C. § 1491.

[2] 54 Stat. 955, 49 U. S. C. § 66. This section provides: "Payment for transportation of the United States mail and of persons or prop-

Government paid the bills of the Bangor and the Seaboard as presented; on post-audit, however, the General Accounting Office made deductions against these respondents' subsequent bills on other shipments, on the ground that the shipments in question should have been carried at the lower, fifth-class, rate applicable to gasoline in steel drums.[3] The bills of the Western Pacific were initially paid at the lower rate. Respondents thereupon brought the present suits to recover the difference between the bills as rendered and as paid in the case of the Western Pacific, and the amount of the deductions in the other two cases.

The Government defended on three grounds: (1) that Item 1820 was inapplicable because absence of burster and fuse deprived these bombs of the essential characteristics of "incendiary bombs," and hence no additional sums were due; (2) that if this tariff item was held to govern, the tariff would be unreasonable as applied to these shipments, and that as to this issue the court proceedings should be suspended and the matter referred to

---

erty for or on behalf of the United States by any common carrier subject to the Interstate Commerce Act, as amended, or the Civil Aeronautics Act of 1938, shall be made upon presentation of bills therefor, prior to audit or settlement by the General Accounting Office, but the right is hereby reserved to the United States Government to deduct the amount of any overpayment to any such carrier from any amount subsequently found to be due such carrier."

[3] It is not entirely clear from the record just what rate the Government believes is applicable to these shipments. It seems to concede that Item 1895 of Consolidated Freight Classification No. 17, covering "Empty Aerial Bombs," does not apply, although this was the original classification assigned to such shipments by the Official Classification Committee, a railroad tariff agency. The essence of the Government's position seems to be that these shipments, being nonincendiary, were a mere combination of gasoline, napalm thickener, and steel casings. Since these three items, standing alone, are all carried at the fifth-class rate, the Government urges that the "combination rule" should apply and the articles be carried at the same fifth-class rate under Rule 18 of Consolidated Freight Classification No. 17.

the Interstate Commerce Commission; and (3) that in any event the Bangor and Seaboard were estopped from charging the "1820" rate.

The Court of Claims, relying on its earlier decision in *Union Pacific R. Co.* v. *United States,* 125 Ct. Cl. 390, 111 F. Supp. 266,[4] entered summary judgment for respondents, two judges dissenting.[5] It held that the shipments in question were "incendiary bombs" within the meaning of Item 1820 of the tariff and thus entitled to the higher rate. In addition, while seemingly recognizing the Government's right to have the defense of unreasonableness determined by the Interstate Commerce Commission, the court ruled that the running of the two-year period of limitations provided by § 16 (3) of the Interstate Commerce Act[6] cut off the right of referral to the Commission. Lastly, the court overruled the defense of estoppel as to the respondents Bangor and Seaboard. Because of the importance of these questions in the administration of the Interstate Commerce Act, and alleged conflict among the lower courts on the issue of limitations, we granted certiorari. 350 U. S. 953.

I.

We are met at the outset with the question of whether the Court of Claims properly applied the doctrine of primary jurisdiction in this case; that is, whether it correctly allocated the issues in the suit between the jurisdiction of the Interstate Commerce Commission and that of the court. In the view of the court below, the case presented two entirely separate questions. One was the question

---

[4] In that case the Court of Claims held Item 1820 applicable to shipments similar to those involved here. The Government did not seek review of that decision.

[5] 132 Ct. Cl. 115, 131 F. Supp. 919. The dissenters were Judge Madden and Chief Judge Jones.

[6] 24 Stat. 384, as amended, 49 U. S. C. § 16 (3).

of the construction of the tariff—whether Item 1820 was applicable to these shipments. The second was the question of the reasonableness of that tariff, if so applied. The Court of Claims assumed, as it had in the *Union Pacific* case, *supra,* that the first of these—whether the "1820" rate applied—was a matter simply of tariff construction and thus properly within the initial cognizance of the court.[7] The second—the reasonableness of the tariff as applied to these shipments—it seemed to regard as being within the initial competence of the Interstate Commerce Commission. Before this Court neither side has questioned the validity of the lower court's views in these respects. Nevertheless, because we regard the maintenance of a proper relationship between the courts and the Commission in matters affecting transportation policy to be of continuing public concern, we have been constrained to inquire into this aspect of the decision. We have concluded that in the circumstances here presented the question of tariff construction, as well as that of the reasonableness of the tariff as applied, was within the exclusive primary jurisdiction of the Interstate Commerce Commission.

The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. "Exhaustion" applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course. "Primary

---

[7] The Court of Claims stated in the *Union Pacific* case, 125 Ct. Cl., at 393, 111 F. Supp., at 268: "At the outset, it should be noted that while this court has no rate-making functions . . . the construction and application of published rates and classifications are proper matters for the courts as well as for the Interstate Commerce Commission."

jurisdiction," on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views. *General American Tank Car Corp.* v. *El Dorado Terminal Co.*, 308 U. S. 422, 433.

No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation. These reasons and purposes have often been given expression by this Court. In the earlier cases emphasis was laid on the desirable uniformity which would obtain if initially a specialized agency passed on certain types of administrative questions. See *Texas & Pacific R. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426. More recently the expert and specialized knowledge of the agencies involved has been particularly stressed. See *Far East Conference* v. *United States*, 342 U. S. 570. The two factors are part of the same principle,

> "now firmly established, that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by prelimi-

nary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure." *Id.*, at 574–575.

The doctrine of primary jurisdiction thus does "more than prescribe the mere procedural time table of the lawsuit. It is a doctrine allocating the law-making power over certain aspects" of commercial relations. "It transfers from court to agency the power to determine" some of the incidents of such relations.[8]

Thus the first question presented is whether effectuation of the statutory purposes of the Interstate Commerce Act requires that the Interstate Commerce Commission should first pass on the construction of the tariff in dispute here; this, in turn, depends on whether the question raises issues of transportation policy which ought to be considered by the Commission in the interests of a uniform and expert administration of the regulatory scheme laid down by that Act. Decision is governed by two earlier cases in this Court. In *Texas & Pacific R. Co.* v. *American Tie & Timber Co.*, 234 U. S. 138, a shipper attempted to ship oak railroad ties under a tariff for "lumber." The carrier rejected them, urging that such ties were not lumber. In a damage action expert testimony was received on the question. This Court, however, held that the Interstate Commerce Commission alone could resolve the question. The effect of the holding is clear: the courts must not only refrain from making tariffs, but, under certain circumstances, must decline to construe them as well. A particularization of such circumstances emerged in *Great Northern R. Co.* v. *Merchants Elevator Co.*, 259 U. S. 285. There the Court held that where the

---

[8] Jaffe, Primary Jurisdiction Reconsidered, 102 Univ. Pa. L. Rev. 577, 583–584 (1954).

question is simply one of construction the courts may pass on it as an issue "solely of law." But where words in a tariff are used in a peculiar or technical sense, and where extrinsic evidence is necessary to determine their meaning or proper application, so that "the enquiry is essentially one of fact and of discretion in technical matters," then the issue of tariff application must first go to the Commission. The reason is plainly set forth: such a "determination is reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of transportation is indispensable; and such acquaintance is commonly to be found only in a body of experts." *Id.*, at 291. We must therefore decide whether a determination of the meaning of the term "incendiary bomb" in Item 1820 involves factors "the adequate appreciation of which" presupposes an "acquaintance with many intricate facts of transportation." We conclude that it does.

A tariff is not an abstraction. It embodies an analysis of the costs incurred in the transportation of a certain article and a decision as to how much should, therefore, be charged for the carriage of that article in order to produce a fair and reasonable return. Complex and technical cost-allocation and accounting problems must be solved in setting the tariff initially. In the case of "incendiary bombs," since it is expensive to take the elaborate safety precautions necessary to carry such items in safety, evidently there must have been calculation of the costs of handling, supervising and insuring an inherently dangerous cargo. In other words, there were obviously commercial *reasons* why a higher tariff was set for incendiary bombs than for, say, lumber. It therefore follows that the decision whether a certain item was intended to be covered by the tariff for incendiary bombs involves an intimate knowledge of these very reasons themselves. Whether steel casings filled with napalm

gel are incendiary bombs is, in this context, more than simply a question of reading the tariff language or applying abstract "rules" of construction. For the basic issue is how far the reasons justifying a high rate for the carriage of extra-hazardous objects were applicable to the instant shipment. Do the factors which make for high costs and therefore high rates on incendiary bombs also call for a high rate on steel casings filled with napalm gel? To answer that question there must be close familiarity with these factors. Such familiarity is possessed not by the courts but by the agency which had the exclusive power to pass on the rate in the first instance. And, on the other hand, to decide the question of the scope of this tariff without consideration of the factors and purposes underlying the terminology employed would make the process of adjudication little more than an exercise in semantics.

The main thrust of the Government's argument on the construction question went to the fact that the shipments here involved were not as hazardous as contemplated by the term "incendiary bomb" as used in the tariff, and that therefore the tariff should not be construed to cover them.[9] Similarly, the dissenting judges below emphasized the absence from the shipments of the commercial factors which call for a high rate on incendiary bombs: "If the reason for the high freight rate is the incendiary quality of the freight, and if the freight does not have the incendiary quality, the reason for the high rate vanishes and the rate should vanish with it." 132 Ct. Cl., at 118, 131 F. Supp., at 921. The difficulty with this line of argument is that we do not know whether

---

[9] In response to the motion for summary judgment the Government presented affidavits by chemical engineers stating that napalm gel is not incendiary. But these affidavits become meaningful only if the court knows the precise relevance of the incendiary quality of the shipments to the setting of the rate.

the "incendiary quality of the freight" was in fact the reason for the high rate, still less whether that was the only reason and how much weight should be assigned to it. Courts which do not make rates cannot know with exactitude the factors which go into the rate-making process. And for the court here to undertake to fix the limits of the tariff's application without knowledge of such factors, and the extent to which they are present or absent in the particular case, is tantamount to engaging in judicial guesswork. It was the Commission and not the court which originally determined why incendiaries should be transported at a high rate. It is thus the Commission which should determine whether shipments of napalm gel bombs, minus bursters and fuses, meet those requirements; that is, whether the factors making for certain costs and thus a certain rate on incendiaries are present in the carriage of such incompleted bombs.

This conclusion is fortified by the artificiality of the distinction between the issues of tariff construction and of the reasonableness of the tariff as applied, the latter being recognized by all to be one for the Interstate Commerce Commission. For the Government's thesis on the issue of reasonableness is not that the rate on incendiary bombs is, in general, too high. It argues only that the rate "as applied" to these particular shipments is too high—*i. e.,* that since the expenses which have to be met in shipping incendiaries have not been incurred in this case, the carriers will be making an unreasonable profit on these shipments. This seems to us to be but another way of saying that the wrong tariff was applied. In both instances the issue is whether the factors which call for a high rate on incendiary bomb shipments are present in a shipment of bomb casings full of napalm gel but lacking bursters and fuses. And the mere fact that the issue is phrased in one instance as a matter of tariff construction and in the other as a matter of reasonableness should not

be determinative on the jurisdictional issue. To hold otherwise would make the doctrine of primary jurisdiction an abstraction to be called into operation at the whim of the pleader.[10]

By no means do we imply that matters of tariff construction are never cognizable in the courts. We adhere to the distinctions laid down in *Great Northern R. Co.* v. *Merchants Elevator Co., supra,* which call for decision based on the particular facts of each case. Certainly there would be no need to refer the matter of construction to the Commission if that body, in prior releases or opinions, has already construed the particular tariff at issue or has clarified the factors underlying it. See *Crancer* v. *Lowden,* 315 U. S. 631. And in many instances construing the tariff does not call for examination of the underlying cost-allocation which went into the making of the tariff in the first instance. We say merely that where, as here, the problem of cost-allocation is relevant, and where therefore the questions of construction and reasonableness are so intertwined that the same factors are determinative on both issues, then it is the Commission which must first pass on them.

---

[10] The artificiality of trying to separate the issue of "construction" from that of "reasonableness as applied" is illustrated by the Court of Claims' holding in the *Union Pacific* case, *supra.* There, after holding that the absence of bursters and fuses did "not affect the identity of the articles" as incendiary bombs, the court went on to say that "it may well be that a lower tariff rate should apply to the carriage of the less hazardous incendiary bomb [one without burster and fuse]. This question is not within our jurisdiction, however, as the question of the reasonableness of rates is a matter entrusted by Congress solely to the Interstate Commerce Commission." 125 Ct. Cl., at 393, 394, 111 F. Supp., at 268. Similarly, the Government here concedes that the question of hazard "goes to the issue of reasonableness," although arguing that it is "also relevant to the question of tariff interpretation, for, like any other instrument, a tariff is to be read in the light of its known purposes and in a manner which avoids unnecessary and gross unfairness."

We hold, therefore, that both the issues of tariff construction and the reasonableness of the tariff as applied were initially matters for the Commission's determination.

## II.

We come then to the question of whether referral of these issues to the Commission was barred by the two-year period of limitation contained in § 16 (3) of the Interstate Commerce Act. We hold that it was not.

Section 16 (3) (a) provides that "all actions at law by carriers subject to this chapter for recovery of their charges . . . shall be begun within two years from the time the cause of action accrues, and not after." [11] This provision makes it clear that where a carrier sues a private shipper the action must be brought within two years. However, the Tucker Act, 28 U. S. C. § 2501, provides that "every claim of which the Court of Claims has jurisdiction shall be barred unless the petition thereon is filed . . . within six years after such claim first accrues." Relying on the broad language of the latter act, the Court of Claims has, since 1926, consistently held that § 16 (3) does not apply to suits by carriers to recover alleged undercharges from the United States as shipper. *Southern Pac. Co.* v. *United States,* 62 Ct. Cl. 391; *Seaboard Air Line R. Co.* v. *United States,* 113 Ct. Cl. 437, 83 F. Supp. 1012; *Union Pacific R. Co.* v. *United States,* 114 Ct. Cl. 714, 86 F. Supp. 907. The present suits were thus held timely brought,[12] even though more than two

---

[11] 24 Stat. 384, as amended, 49 U. S. C. § 16 (3) (a).

[12] The suits were instituted in 1954. In the *Western Pacific* case the carrier's claims accrued in 1948 and 1950, when the United States paid the lower rate instead of the "1820" rate for which it was billed. As to the *Bangor* and *Seaboard* cases, where the United States initially paid the "1820" rate as billed (presumably in 1944 when the shipments were made), and subsequently readjusted that rate on post-audit, it is impossible to say when the claims accrued as the record is silent as to when the post-audit readjustment was made.

years had elapsed since the accrual of the cause of action.[13] However, the Court of Claims held that the two-year limitation of § 16 (3) did bar the Government from obtaining a reference of its defense of unreasonableness to the Interstate Commerce Commission.[14] Presumably it would have ruled likewise as to the issue of tariff construction had it regarded that question as lying initially within the competence of the Commission. In other words, the holding below was that the United States can be sued for six years but can raise certain defenses only if the suit is brought in the first two of those years.

We may assume, without deciding, that the Government would have been barred by § 16 (3) from filing an affirmative suit before the Commission to recover overcharges from a carrier. Nevertheless we do not think that the statute operates to bar reference to the Commission of questions raised by way of defense in suits which are themselves timely brought. Respondents in effect ask us to hold that a suit may be brought for six years but that certain defenses thereto may be raised only for two years. Only the clearest congressional language could force us to a result which would allow a carrier to recover unreasonable charges with impunity merely by waiting two years before filing suit.

---

[13] Although questioning the soundness of this ruling which subjects carriers' claims against the United States as shipper to a more lenient statute of limitations than that applicable to their claims against other shippers, the Government has not challenged it here. We therefore do not pass on it.

[14] The opinion of the Court of Claims does not expressly refer to the two-year period of § 16 (3). The cases cited by the court, however, make it clear that it had in mind that provision, probably § 16 (3)(c), which reads: "For recovery of overcharges action at law shall be begun or complaint filed with the commission against carriers subject to this chapter within two years from the time the cause of action accrues, and not after . . . ."

Section 16 (3) does not deal with referral of questions to the Commission incident to judicial proceedings. On its face it has to do only with the commencement of actions or reparation proceedings before the Commission. There is therefore no language which militates against the conclusion that the statute does not apply to referrals. More important, the basic policy behind statutes of limitations has no relevance to the situation here. The purpose of such statutes is to keep stale litigation out of the courts. They are aimed at lawsuits, not at the consideration of particular issues in lawsuits. Here the action was already in court and held to have been brought in time. To use the statute of limitations to cut off the consideration of a particular defense in the case is quite foreign to the policy of preventing the commencement of stale litigation. We think it would be incongruous to hold that once a lawsuit is properly before the court, decision must be made without consideration of all the issues in the case and without the benefit of all the applicable law. If this litigation is not stale, then no issue in it can be deemed stale.

It is argued that this Court has construed § 16 (3) as "jurisdictional" and that the Commission is therefore barred absolutely from hearing questions as to the reasonableness of rates arising in suits brought after two years, whether such questions come to the Commission by way of referral or in an original suit. Reliance is placed upon *A. J. Phillips Co.* v. *Grand Trunk R. Co.,* 236 U. S. 662; *William Danzer & Co.* v. *Gulf & S. I. R. Co.,* 268 U. S. 633; *Midstate Co.* v. *Pennsylvania R. Co.,* 320 U. S. 356. But these cases all dealt with affirmative claims for the recovery of transportation charges, and not with referrals incident to suits which were originally brought in time. The teaching of the *Midstate* case, for instance, is that the running of the statute destroys the *right* to affirmative recovery as well as the remedy, so that the period of limitations cannot be waived by the parties. But here the

Government is not asserting a right to affirmative recovery. It is seeking only to have adjudicated questions raised by way of defense. It is therefore irrelevant whether the statute of limitations is "jurisdictional" or not; the question would still remain whether Congress intended it to apply to referrals as well as to affirmative suits. Nor does *Morrisdale Coal Co.* v. *Pennsylvania R. Co.*, 230 U. S. 304, help the respondents. There again the statute of limitations was invoked against a plaintiff in order to bar an affirmative claim which was untimely filed. A coal shipper had sued a carrier for damages arising out of the alleged discriminatory allotment of railroad cars for its use. Stating that the propriety of the carrier's method of allotment, even though incident to a damage action, was cognizable only by the Commission, and that redress there was governed by the two-year statute of limitations, the Court held that the statute could not be evaded by filing suit in the District Court, rather than before the Commission, and then having the barred claim adjudicated by referral to the latter. In effect the holding was that the plaintiff had invoked the wrong tribunal, and that since limitations barred suit before the correct tribunal no referral could be made to the latter. *Morrisdale* must be limited to its peculiar facts, and we shall not extend it to bar the referral of defenses in actions properly and timely brought, as the Court of Claims has held this one was.[15]

We are told that the Government can protect itself, when it believes it has been charged an unreasonable rate,

---

[15] The fact that in this instance the issues of tariff "construction" and "reasonableness" were both referrable to the Commission does not, of course, bring the case within *Morrisdale*. Both of these questions were issues only by reason of the Government's defense; neither was part of the carrier's affirmative case. In other words, had the applicability of this tariff not been challenged by the Government, the carrier's own case would have presented nothing which was referrable to the Commission.

by filing an affirmative claim for reparations with the Commission within the two-year period provided by § 16 (3). But Congress has relieved the Government from filing such anticipatory suits by expressly authorizing the General Accounting Office to deduct overpayments from subsequent bills of the carrier if, on post-audit, it finds that the United States has been overcharged.[16] This right was thought to be a necessary measure to protect the Government, since carriers' bills must be paid on presentation and before audit. On respondents' theory the Government could invoke this right only at the peril of losing its defenses in a later suit by the carrier. Evidently this was not the purpose of Congress in authorizing unilateral set-off.[17]

We hold, therefore, that the limitation of § 16 (3) does not bar a reference to the Interstate Commerce Commission of questions raised by way of defense and within the Commission's primary jurisdiction, as were these questions relating to the applicable tariff.

## III.

There remains the question of whether the Court of Claims properly dismissed the Government's defense of estoppel as to the respondents Bangor and Seaboard. We deal with it now because that defense would be reached should the further proceedings below, which must follow in consequence of what we have already said, result in

---

[16] See n. 2, *supra*.

[17] Statistics furnished by the Comptroller General show that since 1948 the General Accounting Office has post-audited 17,220,783 bills presented by carriers. In the same period post-audit revealed overpayment in 1,102,654 cases. The magnitude of these figures underscores the impossibility of requiring the Government to file anticipatory suits before the I. C. C. in every case where it thinks the carrier might later sue to recover the amount set off by the Government.

adherence to the view that Item 1820 applies to these shipments.[18]

The Government's claim is that the Bangor and Seaboard were estopped from charging the "1820" rate because of the Army's reliance on a ruling of the Official Classification Committee, a railroad tariff agency to which these two respondents belonged, that this type of napalm gel bomb shipment would be carried at a lower rate. The Court of Claims rejected this defense because (1) the ruling was later withdrawn by the Committee; (2) the Government had shown no detrimental reliance on the ruling; (3) it had paid the high rate billed for all shipments; and (4) neither carrier had acquiesced in the Committee's ruling.

We think that the Court of Claims erred in disposing of this defense by summary judgment. It appears to be undisputed that the ruling in question was not rescinded until *after* all of these shipments had been made.[19] The Government's affidavits in opposition to the motion for summary judgment were, in our opinion, sufficient to entitle it to an opportunity to prove reliance and detriment. The fact that the Government paid the carrier's bills as rendered is without significance in light of § 322 of the Transportation Act, *supra,* requiring payment "upon presentation" of such bills and postponing final settlement until audit. And the question whether the Official Classification Committee had authority to bind these two carriers to acceptance of a lower rate presents

---

[18] The estoppel defense is not asserted against the Western Pacific, so that this case must in any event go to the Commission. Hence adjudication of the estoppel defense as to the Bangor and Seaboard would no doubt await the Commission's determination as to whether the "1820" tariff was applicable to these shipments, and reasonable if so applied.

[19] The ruling was made in 1943 and was confirmed in 1945. The Bangor and Seaboard shipments were made in 1944.

issues of fact which must be tried. Nor, unlike the case of a private shipper, do we think that the defense of estoppel is unavailable to the Government. See 49 U. S. C. § 22. Cf. *Oregon-Wash. R. & N. Co.* v. *United States,* 255 U. S. 339; *Western Pac. R. Co.* v. *United States,* 255 U. S. 349.[20] We conclude that the Government should have an opportunity to prove estoppel, without any intimation, of course, as to whether it will be able to establish the defense.

The judgment below must be reversed and the case remanded to the Court of Claims for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE DOUGLAS dissents from a reference of these matters to the Interstate Commerce Commission, since he is of the view that the principles of *Great Northern R. Co.* v. *Merchants Elevator Co.,* 259 U. S. 285, are applicable here.

MR. JUSTICE REED and MR. JUSTICE BRENNAN took no part in the consideration or decision of this case.

---

[20] A private shipper may not invoke the defense of estoppel to prevent a carrier from collecting a higher applicable tariff rate than that which may have been actually quoted by the carrier. This results from § 6 (7) of the Interstate Commerce Act, 24 Stat. 380, as amended, 49 U. S. C. § 6 (7), forbidding departures from the published tariff. See *Pittsburgh, Cincinnati, Chicago & St. Louis R. Co.* v. *Fink,* 250 U. S. 577, 583. The same considerations do not obtain when the Government is the shipper, in view of § 22 of the Act, 24 Stat. 387, as amended, 49 U. S. C. § 22, providing that "nothing in this chapter shall prevent the carriage, storage, or handling of property free or at reduced rates for the United States."