**LOUISVILLE AND NASHVILLE RAIL-ROAD COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 2112.

United States District Court
W. D. Kentucky,
at Louisville.

Dec. 30, 1957.

Findings of Fact and Conclusions of
Law Aug. 15, 1958.

H. T. Lively, Joseph L. Lenihan, James W. Hoeland, Louisville, Ky., for plaintiff.

J. Leonard Walker, U. S. Atty., Charles M. Allen, Asst. U. S. Atty., Louisville, Ky., E. Craig Kennedy, Office of the General Counsel, United States General Accounting Office, Washington, D. C., for defendant.

SHELBOURNE, District Judge.

This action was filed in this Court May 3, 1951, by the filing of a complaint in which the Louisville and Nashville Railroad Company sought to recover $7,666.-75, as the alleged balance due plaintiff on freight bills rendered against the Government for transportation charges on airplane landing mats transported by plaintiff, with other connecting common carriers, during the years 1942, 1943, and 1944.

On the bills of lading handled by the plaintiff, as the final and delivering carrier, charges were paid; but, upon a post-audit of the bills by the Comptroller General, it was ruled that the rate applicable to airplane landing mats was a commodity rate applicable on structural forms, to which a lower rate applied. Deductions were made between the rates applicable to airplane landing mats and the commodity rates applicable to iron and steel articles claimed by the Government to be the appropriate charge; thereafter, the plaintiff reclaimed the amount of the deductions, which subsequent claim was denied by the Government and, as a result, this action was filed.

Counsel for the parties, by various written stipulations, stipulated that the time within which an answer should be filed would be extended. On February 28, 1956, an amended complaint was filed, setting out in detail the various shipments, the amount of the claimed transportation charges, and the amount deducted by the Government. On September 10, 1956, the defendant filed an answer, supplemented by a detailed amended answer filed September 12, 1956, to which a reply was ordered filed September 25, 1956. The case was tried to the

Court without a jury on December 10, 1956; counsel for the parties requested additional time for filing briefs, and the case was finally submitted on June 3, 1957.

A written stipulation was filed at the trial, by which it was agreed that Joint Exhibit No. 1 be filed; said exhibit consisted of (1) 285 of the 304 Government bills of lading covering the shipments involved in the suit; (2) the original bills rendered to the defendant by the plaintiff on public voucher forms, Standard Forms 1108 or 1113, as the case may be, showing the charges claimed by the plaintiff and paid by the defendant, together with the check numbers and dates of payment; (3) United States General Accounting Office Forms 1003, issued in the course of the audit of the transportation disbursements, showing the overpayments asserted by the defendant in connection with the individual bills of lading, and (4) appropriate forms showing that the amounts claimed by the defendant to have been overpaid were deducted from amounts otherwise due the plaintiff, and showing the dates of such deductions.

Joint Exhibit No. 2 was filed by agreement, and that exhibit consisted of 13 of the plaintiff's bills covering charges on 19 of the 304 shipments, together with the deduction records pertaining thereto. It was stipulated that the representative movements in the 19 shipments embraced at least one of each of the five separate types of airplane landing mats shipped on the 304 bills of lading, which landing mats were classified as (a) pierced plank, (b) heavy bar-and-rod, (c) light bar-and-rod, (d) Irving grid, and (e) Summerfeld. This exhibit was designed to bring into issue the several types of articles shipped and the several tariffs containing the commodity rates and descriptions relied on by the defendant in this case.

It was stipulated that the determination by the Court, with respect to liability of the parties as to one or more of the selected shipments included in Joint Exhibit No. 2, would govern the question of liability as to all other shipments of the same type included in this suit. It was then stipulated that, when the Court determined the question of liability, the amount due, if any, would be determined by agreement of the parties.

The parties introduced oral testimony, the transcript of which covers 239 pages.

At the time of the trial, the Government contended that this action should be referred to the Interstate Commerce Commission for determination of the tariff issues involved. But, when the Government's brief was filed, its counsel abandoned the position that the case should be referred to the Interstate Commission and conceded that the issues of the case were properly to be determined by this Court. The Government abandoned its contention of primary jurisdiction in the Interstate Commerce Commission. See United States v. Western Pacific Railroad Co., 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126.

The airplane landing mats are of five types, as follows:

(1) Pierced Plank: Panels made of mild sheet steel, perforated, each panel being 10 feet x 15 inches in size, weighing 64 pounds, shipped 30 panels to a bundle, average loading 100,000 to 110,000 pounds per car.

(2) Heavy Bar-and-Rod: Panels made of mild steel bars and rods, welded at intersections, each panel 12 feet x 3 feet in size, weighing 140 pounds, shipped 14 panels in a bundle, average loading 100,000 to 110,000 pounds per car.

(3) Light Bar-and-Rod: Panels made of mild steel bars and rods, welded at intersections, each panel 12 feet x 3 feet in size, weighing 68 pounds, shipped 30 panels to a bundle, average loading 100,000 to 110,000 pounds per car.

(4) Irving Grid: Panels made of mild steel bars, deformed and drawn together in center, welded, each panel 12 feet x 22 inches in size, weighing 129 pounds, shipped 16 panels to a bundle, average loading 100,000 to 110,000 pounds per car.

(5) Summerfeld: Woven wire mesh in rolls, 75 feet x 10 feet 4 inches in size, each roll weighing 935 pounds, average loading 90,000 to 100,000 pounds per car.

The Court concludes that the identity of the articles shipped will determine the applicable rate.

At the trial, General R. G. Breene, a retired Major General from the United States Air Force, testified for the plaintiff. Under Lt. General Harmon, who was designated to command the South Pacific area, General Breene was in charge of the service of supplies and remained at said task as long as the South Pacific was an active theater of World War II. From the testimony of General Breene, it is apparent that the landing mats could not be properly classified as floor plates or concrete or plaster reinforcements, but represented fabricated steel so perfected that a floor for the landing and taking-off of airplanes could be quickly laid in emergency and in quickly developed airfields, especially where the terrain was soft and marshy.

Mr. G. G. Greulich, a consulting engineer with United States Steel Corporation who also testified for the plaintiff, described the development of the mats, corroborating in many respects the testimony of General Breene.

Mr. William Bruce Spangler, a civil engineer from the Corps of Engineers, United States Army; Mr. Homer S. Paul, senior civilian in charge of rate negotiations in the Office of Chief of Transportation, Freight Traffic Division, Department of the Army, and Mr. Thomas C. McNeill, a transportation specialist in the Transportation Division of the United States General Accounting Office, testified for the Government. From their testimony, it is apparent to this Court that the predominant use which the landing mats served determines their classification in transportation. While there may be, as the Government contends, similarity between the landing mats and catwalks for freight cars, sidewalk gratings, woven wire fencing, and subway gratings, the predominant use and the use for which the landing mats were designed and fabricated, as well as the use to which they were finally put, was to construct floors for airfields. Technical designing and manufacturing was necessary in the perfection of the mats so as to enable the Army to construct fields of various lengths and widths. The Court concludes that commodity rate tariffs or Exceptions to the Classification do not provide the proper classification of the landing mats.

Prior to December 14, 1942, the landing mats were rated under the Rule of Analogy in the Classification. On December 14, 1942, the carriers established in the Classification a specific description and a specific rating on airplane landing mats; February 25, 1943, carriers issued a Section 22 Quotation, giving the Government the benefit of commodity rates in certain iron and steel articles, but without land-grant deduction and subject to the proviso that if the class rates produced lower charges such class rates should be applied.

The Court concludes that the plaintiff is entitled to a recovery in this action. Counsel for the plaintiff will furnish to the Court, on notice to the Government's counsel, findings of fact, conclusions of law in accordance herewith, and a proposed judgment providing for an accounting unless the parties are able to stipulate the amount recoverable by judgment as they have indicated by stipulation they would be able to do.

### Findings of Fact.

1. By this action, plaintiff, as delivering carrier, seeks to recover additional transportation charges alleged to be due it from the defendant on 304 shipments of airplane landing mats which moved during the years 1942, 1943 and 1944. The complaint, as amended, is in 39 counts, and the aggregate recovery sought is in excess of $48,000.

2. At issue is the question of the freight rates applicable to shipments during each of three distinct periods:

(a) During the period prior to December 14, 1942, when the railroads had no specific ratings applicable to airplane landing mats;

(b) During the period from December 14, 1942, through February 24, 1943, the railroads having established on the former date specific ratings on airplane landing mats;

(c) During the period commencing February 25, 1943, the railroads having issued on that date to the United States a special quotation under Section 22 of the Interstate Commerce Act, 49 U.S.C.A. § 22, giving the Government certain alternative rates on landing mats.

3. The airplane landing mats involved in this action were of five distinct types:

(a) The pierced plank type, manufactured of sheet steel, each panel being about 10 feet long by 15 inches wide;

(b) The heavy bar-and-rod type, measuring 12 feet long by 3 feet wide;

(c) The light bar-and-rod type, measuring the same as the heavy type but made of smaller sized bars and rods;

(d) The Irving grid type, made of different sizes of longitudinal and transverse bars welded together to form a rectangular mat measuring 12 feet by 22 inches in size;

(e) The Summerfeld type, made of reenforced wire mesh in rolls measuring 75 feet by 10 feet, 4 inches.

4. The defendant contends that for the purpose of determining the applicable freight rates, the five types of airplane landing mats above described are fairly embraced by other tariff descriptions taking lower rates than these applicable to airplane landing mats. That is to say, defendant contends that the pierced plank type of airplane landing mat takes the rate applicable to "floor plate"; that the light bar-and-rod type, the heavy bar-and-rod type, and the Summerfeld type take the rates on "concrete or plaster reinforcements"; and that the Irving grid type take the rates on "bar mesh"—all as published in commodity rate tariffs or in exceptions to the Southern Freight Classification. As conceived by the defendant, the problem in this case is one of tariff interpretation.

5. The plaintiff, on the other hand, contends that the problem before the Court is one as to the identity of the commodity shipped; and that Rule 17 of the Classification, the Rule of Analogy, by its own terms does not apply in connection with ratings or rates published in exceptions to the Classification or in commodity tariffs.

6. The plaintiff produced as a witness G. G. Greulich, who, as an engineering consultant in the employ of U. S. Steel Corporation, developed the design of the pierced plank type of airplane landing mat. He testified that in 1939 the War Department sent his company pictures of various devices which had been used by European armies to improve the surface of landing fields; that bridge flooring was ruled out as being too heavy for the job; and that in 1940 the problem of developing a suitable landing mat was assigned to the Army's Corps of Engineers at Fort Belvoir. Witness Greulich testified that he conceived the idea of making the landing strip cover in the form of "articulated steel carpet" and that by April or May of 1941, the pierced plank type of mat had been perfected to the point where the Army placed an order for five or six million feet of it. Eighty-five per cent of all landing mats manufactured were, according to the defendant's witness McNeill, of the pierced plank type.

7. Mr. Greulich further testified that there is a great deal of difference between the pierced plank type of landing mat and "floor plates", the former being a "highly refined fabricated article" and the latter being produced at the rolling mill. It was further shown by witness Greulich that the Irving grid landing mat differs in construction from what is known as bar mesh in the iron and steel trade; and that neither the heavy nor the light bar-and-rod type of landing mat comes within the description "concrete or plaster reinforcements" because of differences in the manufacture of the items. Mr. William

Bruce Spangler, a civil engineer in the employ of the Army Corps of Engineers, a witness for the defendant, admitted on cross-examination that the Summerfeld type of landing mat requires further fabrication beyond that required in the manufacture of mesh wire.

8. General R. G. Breene, a retired Major General of the United States Air Force, testifying for the plaintiff, stated that he was in charge of the Service of Supply in the South Pacific area throughout the period that the theatre was active in World War II. It is apparent from General Breene's testimony that the landing mats were a specially designed product, intended for a specific use, and they cannot properly be classified as floor plates or concrete or plaster reinforcements.

9. The predominant use of the five types of article at issue herein, as well as the use for which they were designed and fabricated, was that of landing mats for the construction of floors for airfields.

Conclusions of Law.

1. The Court has jurisdiction of the parties and the subject matter of the action. 28 U.S.C. § 1346(a) (2). Compare United States v. Western Pacific R. Co., 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126.

2. The predominant use of a commodity determines its classification for purposes of transportation by railroads. Apex Steel & Supply Co. v. Erie R. Co., 276 I.C.C. 528. See also War Materials Reparation Cases, 294 I.C.C. 5, 84, and Western Pacific R. Co. v. United States, 147 F.Supp. 479, 137 Ct.Cl. 394.

3. During the period prior to December 14, 1942, the applicable rates on the shipments involved in this action were the class rates determined by applying the Rule of Analogy in the Classification; during the period from December 14, 1942, through February 24, 1943, the applicable rates were the class rates determined by applying the rating for the specific entry in the Classification reading: "Landing Mats or Runways, airfield"; and during the period com-

mencing February 25, 1943, the applicable rates were those authorized by the special quotation under Section 22 of the Interstate Commerce Act, namely, the commodity rates on certain iron and steel items, without land grant deduction, or the class rates less land grant deduction, whichever produced the lower charges.

4. Plaintiff is therefore entitled to recover in this action, and the parties having stipulated that when the question of liability shall have been determined by the Court the amount due the plaintiff will be for determination by agreement of the parties, and pursuant to such stipulation the parties having agreed that the amount which the plaintiff is entitled to recover of the defendant is $47,263.41, the plaintiff is entitled to recover such sum.