Reed, Justice (Ret.),
sitting by designation, delivered the opinion of the court:
During the years from 1942 through 1945 the plaintiff and its connecting carriers transported quantities of army half-tracks over its lines within the United States at the instance of the defendant. The bills of lading indicated that the articles were to be shipped at the “class rate,” and, indeed, the Government paid for the service on that assumption. Recently the defendant recouped certain amounts from other debts owing the plaintiff on the theory that it was obligated to pay for the transport at the “commodity rate” rather than at the “class rate.” Other sums were refunded by the plaintiff under protest. Two suits were commenced in this court, and the cases were submitted to the Commissioner; by stipulation of the parties, their disposition awaits our determination as to which of the two rates was properly applicable.
A commodity rate is usually lower than the class rate[1] and is promulgated for specific items generally moving between specified points. In effect, the commodity rate is an exception to the class rate. When the Interstate Commerce Commission rules on the question of reasonableness, determination of the justification or lack of justification for a particular commodity rate involves consideration of such factors as the volume[2] and regularity [3] of movement. If the volume is large and the movement is regular, the item is usually entitled to a commodity rate. It is somewhat difficult to discover the considerations which prompted the Commission to approve the existence of any such differentiation on the basis of volume or regularity of traffic since these considerations are not necessarily related to railroad costs. While volume shipments by particular firms save the carrier expense, numerous small shipments of the same item probably do not, except in so far as total density of traffic is increased. See Sharfman, The Interstate Commerce Commission, Yol. III-B, pp. 510-18 (1936).
*21 We do not find, however, that the Commission in performing its adjudicatory function of determining whether the class or commodity rate applies, takes into account the factors relative to reasonableness. For example, examine Turner Marble & Granite Co. v. Atlantic, Coast Line R. Co., 147 I.C.C. 796. We conclude that courts may determine the classification of these vehicles as readily as the Commission. In short, since the agency does not use its expertize in deciding these cases, we see no reason to refer the case to that body under the doctrine of primary jurisdiction. See United States v. Western P. R. Co., 352 U.S. 59; see also Great Northern R. Co. v. Merchants Elevator Co., 259 U.S. 285.
As found by the Commissioner, the halftrack is an armored vehicle with a truck axle and wheels in the front and a tank-like track and suspension system in the rear. The halftracks shipped were adapted for various purposes — in general, the transportation of cargo and personnel. The “Half-Track Personnel Carrier M3” and “M3A1,” as the name implies, were constructed for the primary purpose of transporting military personnel under combat conditions. Others were designed as gun-mounts for mortars and machine guns. One of the latter, the “Half-Track Car M2,” could be used as the prime mover for the 105-mm howitzer; or, in less technical language, it was capable of towing the mounted artillery piece. Others could be used for towing 57-mm anti-tank guns.
In 1941, at the request of the Quartermaster General, the Association of American Railroads established a class rate for “Half-tracks, army, with or without ramps (runways).” In 1944, the War Department requested a commodity rate for these vehicles; in both 1944 and 1945 the railroads refused to publish such a rate. The United States now contends that a commodity rate was in effect at the time which covered half-tracks. It applied to “vehicles, motor, dumping or hauling with lug wheels, tractor lug tires, or crawler type.” (Finding 9) The tariff also contained a “Rule 38” which provided in pertinent part that:
“Unless otherwise provided in the governing tariffs, if there is an effective commodity rate on a given shipment *22 that rate and not the class rate must ,be applied, except that rates (either class or commodity) specifically designated as applicable on import, export, coastwise or inter-coastal shipments must be applied on such shipments to the exclusion of all other rates not so designated.”
In 1931 we held that under Bule 38 if the commodity rate and the class rate apply to the same article, the former governs, and we indicated that the description contained in the bill of lading is not dispositive or even relevant to the issue. Chicago, B. & Q. R. Co. v. United States, 73 Ct. Cl. 250. That decision has not been overruled nor distinguished in the past thirty years, and we adhere to it now. And we find support for it in Commission decisions both preceding and succeeding it. Turner Marble & Granite Co. v. Atlantic Coast Line R. Co., 147 I.C.C. 796 (1928); Hungerford & Terry, Inc. v. Pennsylvania R. Co., 198 I.C.C. 65 (1933). In those latter cases the Interstate Commerce Commission held that even a general commodity rate is to be applied rather than a class rate which specifically includes the item. Commission holdings establish the proposition that the bill of lading designation is irrelevant. See, e.g., Penn Facing Mills Co. v. Ann Arbor R.Co., 182 I.C.C. 614. Of course, the Twmer Marble and Rungerford cases, supra, also ruled that if the class rate indicates a contrary intent, the commodity rate, even if applicable, will not govern. Originally, both the “dumping and hauling” and “halftrack” classifications were separate categories in the class rate. Only the “dumping and hauling” item was removed from the class rate schedule and made the subject of the commodity rate. But since such classifications may overlap, we do not think that the excision of only the “dumping and hauling” item necessarily indicates that it did not include halftracks.
Thus, we conclude that the only question for decision is whether the commodity rate applies to halftracks. This court has held that it will not depart, except in unusual cases, from a decision of the Interstate Commerce Commission, even though the court has jurisdiction to decide the question initially. Western Pacific R. Co. v. United States, 132 Ct. Cl. 150. While the Commission in the War Materials Separation Cases, 294 I.C.C. 5, 76, indicated that there were no *23 commodity rates on. “any” combat vehicles, including half-tracks, during the Second World War, the issue before it was whether the class rates were reasonable. Assuming that the Commission is more able than a court to decide a question of tariff interpretation of this sort, needless to say we defer to the experience of that body only when it has directed its attention to the matter in question. This we do not believe the Commission did in the above-cited case.
Because the halftrack is clearly a crawler-type vehicle within the meaning of the commodity tariff, the crucial inquiry is whether it is used for “hauling.” Since 1787 the word “haul” has included the transportation of goods generally and has not been limited to towing.[4] And we take judicial notice of the fact that in ordinary commercial intercourse it is so used. Thus, the commodity rate may properly be said to include the transportation of vehicles such as trucks and, in particular, army halftracks.
Since we hold that the commodity rate applied, judgments are for the plaintiff in the amount of $985.15 in case No. 333-54 and $2.40 in case No. 10-53.
It is so ordered,
Durfee, Judge; Laramore, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.
FINDINGS OE FACT
The court having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, the concessions and stipulation of the parties, and the briefs and arguments of counsel, makes findings of facts as follows:
1. The plaintiff, a corporation of the State of Kansas, is a common carrier by railroad over its own lines and jointly with other common carriers by railroad.
2. During the years 1942, 1943, 1944 and 1945, plaintiff and its connecting carriers performed transportation services for defendant by carrying certain shipments described on Government bills of lading as Army Halftracks, designated as M-2, M-2(A-1), M-3, M-3(A-1), M-4(A-1), and *24 M-16 from various points of origin in the United States to points of destination on plaintiff’s lines.
3. Eight of the halftracks in suit were shipped on Government bills of lading describing the items variously as “half-track Army (Carriage MTR MUL gun M-16)” and “half-track, Army (M16) ”, while the inbound bills of lading refer to these same items as “Army half-track W-guns MTD”. The shipping weight of the M-16’s provided in the bills of lading, when compared to the general data concerning the vehicle contained in the applicable Army Technical Manual, indicates that the vehicles were shipped without guns being mounted thereon, and it is concluded that, while the M-16 was designed as a mobile gun mount, the particular vehicles described by the bills of lading were shipped separately from the guns and assembled at destination in the field. Because the defendant did not consider the M-16’s to be combat vehicles, $565.24 was withheld representing alleged excess transportation charges.
4. All of the halftracks involved herein were armored vehicles consisting of a specially designed, commercial type, front and rear drive, truck-chassis, with a wheel suspension in front and a track and suspension system in the rear to facilitate travel over rough terrain. All of them had % inch armor plate with the exception of the windshield plate and door shield sliding plates, which were % inch thick. Each vehicle had seating arrangements in the body for a crew of from 5 to 13 men, plus seats for three in the driver’s compartment. The particular types of halftracks involved in these actions had the following special characteristics, as described collectively in the official Catalogue of Standard Ordnance Items, and the applicable Army Technical Manual:
HALE-TRAOK OAR M2-LIMITED STANDARD, has Seats for a crew of ten. A skate rail surrounds the interior of the vehicle. By the use of two carriage mounts, a cal. .30 and a cal. .50 machine gun can be moved along this rail and fired in any direction.
This vehicle can be used as a prime mover for the 105-mm howitzer.
HALE-TRAOK OAR M2A1 — LIMITED STANDARD, is similar to the M2 but has an M49 ring mount for cal. .50 machine *25 gun oyer the assistant driver’s seat. By use of this mount the cal. .50 HB machine gun can be traversed 360° from a single position, permitting rapid fire against low-flying aircraft as well as against ground targets. It can be elevated from —15° to +85°.
Three fixed pintle sockets are mounted, one on each side and one on the rear of the body, permitting the use of a cal. .30 machine gun.
HALE-TRACK PERSONNEL CARRIER M3-LIMITED STANDARD, is generally similar to the M2 but has seating accommodations for 13 men. The body is about 10 inches longer than on the M2 and has a door at the rear. Instead of a skate rail, the vehicle has an M25 pedestal mount for a cal. .30 machine gun, which is secured to the floor of the personnel compartment.
This half-track, with modifications, is used as the chassis for several gun motor carriages.
HALF-TRACK PERSONNEL CARRIER M3A1-LIMITED STANDARD, is similar to the M3 but has an M49 ring mount for a cal. .50 machine gun over the assistant driver’s seat.
Three pintle sockets are mounted, one on each side and one on the rear of the body.
í* Í*
81-MM Mortar Oarrier Ml¡, * * *. This vehicle carries a crew of six men with the usual seating arrangement for three in the driver’s compartment. The vehicle has a gun ring running completely around the inside of the body, mounting one cal. .50 and one cal. .30 machine gun on skate mounts. One cal. .45 submachine gun and one 81-mm mortar complete the armament. * * *.
81-MM Mortar Oarrier Mlf.Al * * *. The M4A1 vehicle is identical with the M4 except for the addition of two stowage boxes on the rear end of the body. * * * The M4A1 carries one cal. .50 machine gun on a skate mount, one cal. .45 submachine gun, and one 81-mm mortar.
H: H$ $ H* ‡
Multiple Gum, Motor Carriage M16 * * *. This vehicle carries a crew of five men, has an electrically operated gun turret, and carries its own battery charging unit. The turret mounts four cal. .50 machine guns. There is no gun rail, pedestal mount, or rear door on this model. The folding panels at the sides and rear of the body have a dip or section cut out of their top edges to permit more gun depression. * * *.
*26 5. War Department Technical Manual, TM 9-2800, page 10, shows a picture of a Model M-2 halftrack with a roller and states that its purpose is “To carry cargo and personnel in combat.” Page 12 of the same Manual also shows a picture of a Model M-2 halftrack but it is equipped with a winch instead of a roller. The purpose of this halftrack is stated to be “To transport cargo and personnel in combat zone.” The purpose of the Model M-3 halftrack shown on pages 14 and 16 of the Manual is “To transport personnel in combat zone.” Some of the uses to which halftracks were put in combat areas were: (1) Towing 57-mm antitank guns; (2) use as a self-propelled gun carriage and platform for either a 75-mm gun or a 37-mm repeat fire cannon or four 50 caliber antiaircraft machine guns; (3) to carry communication equipment for armored divisions; (4) as an ambulance with armored infantry units; and (5) as a maintenance truck to accompany tank units.
6. On September 19, 1942, contract No. W-303 ord-2080 U.S.A. 3.10 was executed between the War Department and the White Motor Company to furnish and deliver halftrack cars, M-2. This contract required that the manufacturer furnish on each vehicle the following pioneer tools and brackets and machine gun tripod brackets:
Ax, Mounting brackets and straps
Mattock, mounting brackets and straps
Shovel, Mounting brackets and straps
Cross Cut Saw and Canvas Case
Canvas Water Bucket
Tripod Brackets for two .30 calibre tripods
Tripod Brackets for one .50 calibre tripod
It is concluded that all of the pioneer equipment and ma chine gun tripod brackets enumerated above were shipped with the M-2 halftracks.[1]
*27 7. The Association of American Railroads on November 27,1941, received a letter from the Quartermaster General of the War Department requesting that a classification item of Class 40 Official, Class 6 Southern, and Class A Western, minimum 20,000 pounds, be established on ordnance halftrack cars. The classification committees of the railroads complied with the request of the Government. Effective December 31, 1941, a new item 43813 was established under the generic heading of “Vehicles, Motor: half tracks, Army, with or without ramps (runways),” in Supplement No. 18 to Consolidated Freight Classification No. 14, providing ratings of Class 40 Official, Class 5 Southern, and Class A Western, minimum 24,000 pounds, on the subject item.
8. Consolidated Freight Classification No. 15, in effect at the time of the shipments herein, contains the following pertinent classifications and rules:
ARTICLES Item Vehicles, Motor: Less Carload carload minimum ratings (pounds) Carload ratings
43810 Dumping or hauling, with lug wheels, tractor lug tires, or crawler type, SU, loose or in packages_ 24, OOOR 40-5-A
43812 Half-tracks, army, with or without ramps (runways) 1 24,00OR 40-5-A
H* H» H» * ❖
Rule 2
DESCRIPTIONS SHOULD CONFORM TO CLASSIFICATION DESCRIPTIONS
Section 1. Descriptions of articles in shipping orders and bills of lading should conform to classification or tariff descriptions. When different ratings are provided for an article according to type of packing or package, the shipping conditions should be shown. Shipping orders and bills of lading for LCL shipments must specify number of articles, packages or pieces.
Section 2. Carriers reserve the right to inspect shipments where necessary to determine lawful ratings. When found to be incorrectly described freight charges must be collected according to proper description.
*28 Rule 17
CLASSIFICATION" BY ANALOGY
Wben articles not specifically provided for nor embraced in tbe classification as articles “noibn” are offered for transportation, carriers will apply the classification provided for articles which, in their judgment, are analogous; in such cases agents must report facts. to proper officer of Freight Department in order that rating applied may be verified and necessary classification provided. This rule will not apply in connection with ratings or rates published in Exceptions to the Classification or in commodity tariffs.
% % * ❖ £
Rule 88
APPLICATION OF COMMODITY RATES VERSUS CLASS RATES
(a) Unless otherwise provided m the governing tariffs, if there is an effective commodity rate on a given shipment that rate and not the class rate must be applied, except that rates (either class or commodity) specifically designated as applicable on import, export, coastwise or inter-coastal shipments must be applied on such shipments to the exclusion of all other rates not so designated.
9. Trans-Continental Freight Bureau West-Bound Tariff No. 1 Series naming commodity rates from and to all points of origin and destinations herein in effect at the time of these shipments, which was governed by Western Classification Rules and Regulations and was initially effective February 15,1934, contained in Item No. 3960 a rate under the generic heading—
MACHINERY OR MACHINES (EXCEPT CONCRETE MIXING MACHINES) OR PARTS IN PACKAGES AS PROVIDED, (OR LOOSE, IF SO PROVIDED) IN WESTERN CLASSIFICATION, VIZ :
VEHICLES, MOTOR, DUMPING OR HAULING WITH LUG WHEELS, TRACTOR LUG TIRES OR CRAWLER TYPE.
This commodity description was subsequently republished effective August 15, 1941, and August 15, 1944, although on the latter date it was contained in Item 6150.
10. A class rate is a rate determined from the class tariffs on an article that has a rating found in the classification *29 tariffs. Railroads are required by statute to publish a classification tariff and a class rate tariff on all commodities they hold themselves out to transport for the general public throughout the United States. The railroads also publish commodity rates. Commodity rates are ordinarily reduced rates which are specifically established for a specific purpose on a specific commodity, to cover a specific movement between specific points.
11. On September 16,1944, Brigadier General W. J. Williamson addressed a letter to the Chairman of the Transcontinental Freight Bureau, reading in part as follows:
THE WAR DEPARTMENT IS MAKING NUMEROUS CARLOAD SHIPMENTS OP ARMY COMBAT VEHICLES FROM OFFICIAL SOUTHERN, WESTERN TRUNK LINE AND SOUTHWESTERN TERRITORIES TO PACIFIC COAST POINTS. THE MOVEMENT INCLUDES DOMESTIC AND EXPORT SHIPMENTS. THE VEHICLES CONSIST OF ARMORED CARS, ARMY TRACTOR TANKS, GUN CARRIAGES OR MOUNTS, HALF-TRACKS, AND TANK RECOVERY UNITS.
Ü: * * * *
To provide for traffic, other than trans-continental, the following rates have been established: Official Territory-Class 40; Southern-Class 40; Western Trunk Line and Southwestern Territories-Class 45. There is no basis provided for trans-continental traffic, other than the full classification basis of Class A.
In order to provide a proper basis of rates on this traffic, it is requested that the carriers publish in T.C.F.B. tariffs 1-Y, 4-U and 29-G, Agent L. E. Kipp’s I.C.C. Nos. 1507, 1499 and 1500 respectively, for application on the descriptions shown in Exhibit A, the rates and minimum weights shown, as proposed, in Exhibit B. The proposed descriptions are the same as the Consolidated Classification. The proposed minimum weights are graduated to meet the requirements of the traffic. The alternative rates and minimum weights conform to the established practice on trans-continental traffic.[2]
*30 On November 22, 1944, Mr. A. F. Cleveland of the Association of American Railroads replied as follows to General Williamson’s request:
The Trans-Continental class rates are not now inconsistently related to Class A or Column 45 rates which are in effect to border line points, such as El Paso, Tex., Utah Common points or Montana Common points. The present Trans-Continental rates on machinery, tractors and grading and road-making machinery were made under extreme water competitive conditions which do not exist on the class of traffic embraced in this proposal. After consulting the directly interested Transcontinental lines, the Chairman’s Committee disapproved the proposal.
On March 5,1945, after a request by the War Department to review Trans-Continental Freight Bureau’s refusal to publish a commodity rate, the Association of American Railroads informed the War Department that the request of the War Department for a commodity rate could not be granted. Subsequent requests for review were again denied on May 28, 1945; August 22,1945, and August 31,1945.
On July 30,1946, a Section 22 Quotation was promulgated offering reduced rates to the United States Government on shipments of combat vehicles between Eastern Territory and Pacific Coast ports.
12. The Complaint filed by the Department of Justice before the Interstate Commerce Commission in Docket No. 29917 (a case concerning the reasonableness of the rates on combat vehicles, including “half tracks, and similar equipment with guns mounted thereon, or equipped so that guns may be affixed thereto, together with accompanying accessories and tools designed for use in active warfare or armed combat”), stated that, “At no time during the period covered by this Complaint did the defendants publish and maintain for application between the rate groups and bases named commodity tariffs specifically describing such vehicles and providing commodity rates therefor. The ratings provided for such vehicles, as aforesaid, were generally Class A minimum weight 40,000 pounds if guns were mounted and 20,000R pounds if guns were not mounted.”
*31 13. The parties have stipulated and agreed that the only issue remaining herein is whether the charges for the shipments of Army halftracks should be computed on the basis of the commodity rates applicable to “vehicles, motor, dumping or hauling with lug wheels, tractor lug tires, or crawler type”, as contended by the defendant, or on the basis of the Class A rating set out in the Consolidated Freight Classification, as contended by plaintiff.
14. If the freight charges should be computed as contended for by the plaintiff, the plaintiff is entitled to a judgment in the amount of $8,930.70 in case No. 333-54, and the sum of $4,274.03 in case No. 10-53. If the freight charges should be computed as contended for by defendant, the plaintiff is entitled to a judgment in the amount of $985.15 in case No. 333-54, and the plaintiff is entitled to recover the amount of $2.40 in case No. 10-53.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgments herein, the court concludes as a matter of law that plaintiff is entitled to recover, and it is therefore adjudged and ordered that plaintiff recover of and from the United States the sum of nine hundred eighty-five dollars and fifteen cents ($985.15) in case No. 333-54 and the sum of two dollars and forty cents ($2.40) in case No. 10-53.

 It takes unusual circumstances to justify one higher than the class rate. See Schenley Distillers, Inc. v. Cincinnati, N.O. & T.P.R. Co., 289 I.C.C. 709, 714.

 See, e.g., Federated Metals Corp. v. Central R. Co., 113 I.C.C. 487, 492.

 See, e.g., H. J. Heinz Co. v. Director General, 112 I.C.C. 206, 212.

 Shorter Oxford English Dictionary. “Haul” is similarly defined in Webster’s Third New International Dictionary (1961).

 All of the M-2 halftracks Involved In these actions were said by defendant to have been shipped on two bills of lading, one of which distinctly stated that the factory-furnished equipment accompanied the vehicles in shipment, and the other bill of lading did not so state specifically. The exhibits containing photostatle copies of the bills of lading are largely Illegible and difficult to comprehend even If legible. It is assumed that defendant’s statement was an accurate reflection of the record.

 This letter specified weights of from 14,375 to 19,700 pounds for the halftracks. Both the net and the gross weights of all the halftracks involved in these actions came within these limits, except the M-2 and M-3 whose net weights were slightly under the lower limit proposed in the letter.