**PORTO TRANSPORT, INCORPORATED, Plaintiff,**

v.

**CONSOLIDATED DIESEL ELECTRIC CORPORATION and Eur-Pac Corporation, Defendants.**

United States District Court
S. D. New York.
Nov. 25, 1960.

See, also, 21 F.R.D. 250.

Joseph M. Cohen, New York City, for plaintiff.

Hays, Algase, Feuer, Porter & Spanier, New York City (Mortimer Feuer and Martin Mensch, New York City, of counsel), for defendant Consolidated Diesel Electric Corp.

Sturm & Perl, New York City (Abraham Fishbein, New York City, of counsel), for defendant Eur-Pac Corp.

FRIENDLY, Circuit Judge.

This is an action by Porto Transport, Inc., a common carrier by motor truck engaged in interstate commerce, to recover from the defendants amounts allegedly owing as additional freight for the transportation of certain articles claimed to have been erroneously classified in violation of Part II of the Interstate Commerce Act, §§ 216, 217, 49 U.S. C.A. §§ 316, 317. Plaintiff moved for referral of the issue of proper classification to the Interstate Commerce Commission. Although plaintiff now argues, as do both defendants, that the proper classification should be determined by this Court rather than by the Commission, I think it clear that the reference should be ordered.

Defendant Consolidated Diesel Electric Corporation—herein "Consolidated"—manufactures a device which it terms a "Self-propelled Electric Power Plant," and which the United States Navy has designated as the "NC–5." Consolidated's brochure describes the NC–5 as "a highly mobile, compact, self-contained source of electric power for starting, servicing, and towing aircraft and related equipment." In external design the NC–5 resembles a Jeep; however, it is equipped with two industrial type generators and a rectifier, as well as related controls, designed for the servicing of aircraft on the ground or aboard a Navy carrier.

In 1953 Consolidated and Eur-Pac entered into contracts whereby Eur-Pac undertook to package and deliver a number of NC–5s which the Government had purchased from Consolidated. Eur-Pac was to pick up the units at Consolidated's plant in Stamford, Connecticut. Pursuant to a further agreement, plaintiff Porto Transport, Inc. (formerly known as T. Porto & Sons, Inc.) transported 47 shipments of NC–5s from Stamford to Eur-Pac's Brooklyn warehouse between December 11, 1953 and June 7, 1954. Freight charges were billed in accordance with a rate classification which defendants assert to have been determined by Porto after inspection of the items to be shipped. At the time of this contract

the governing tariff to which the plaintiff was a party made no reference to chassis-mounted, self-propelled power units for servicing aircraft. Without designating the listed category to which the NC–5s were assigned, Porto accorded them a fourth or fifth class rate and collected from Eur-Pac a total freight charge of $2,892.24.

Subsequently plaintiff concluded that the NC–5 had been improperly classified, and that as a result an insufficient freight had been charged. Asserting that the proper classification was "motor vehicle chassis combined with generators," and assimilating this original formulation into the tariff category "automobile chassis," plaintiff sought to recover the difference between the freight charged and $11,746.31, the gross freight which allegedly would have been charged under the first-class rating assigned to articles in the suggested category. The Interstate Commerce Commission twice refused plaintiff's requests to determine its claim, for want of jurisdiction. This action was brought early in 1956.

Consolidated and Eur-Pac, sued as joint defendants, interposed a number of defenses and cross-claimed against each other. After the Supreme Court's decision in United States v. Western Pac. R. Co., 1956, 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126, plaintiff moved that the cause be referred to the I.C.C. under the doctrine of primary jurisdiction for an interpretation of the applicable tariff. Pursuant to an order by Judge Dimock, a separate trial has been held on the issue raised by this motion.

■ The Supreme Court has stated that if the language of a tariff is not technical and words are used in their ordinary meaning, the court should construe the tariff as it would any other document, Great Northern R. Co. v. Merchants' Elevator Co., 1922, 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943; Brown & Sons Lumber Co. v. Louisville & N. R. Co., 1937, 299 U.S. 393, 397, 57 S.Ct. 265, 81 L.Ed. 301. However, if the words are used in a technical sense or if understanding of the principles of cost allocation that underlay

the computation of the tariff is crucial to its interpretation, the issue should be referred to the I.C.C., United States v. Western Pacific R. Co., supra.

In the Western Pacific case a carrier brought suit against the United States on the ground that Army shipments of aerial bomb cases filled with napalm gel should have been classified under the applicable tariff as "incendiary bombs" rather than as "gasoline in steel drums," despite the absence of the igniting mechanism. On its own motion, the Supreme Court held that the question must be decided by the I.C.C.:

> "Whether steel casings filled with napalm gel are incendiary bombs is, in this context, more than simply a question of reading the tariff language or applying abstract 'rules' of construction. For the basic issue is how far the reasons justifying a high rate for the carriage of extra-hazardous objects were applicable to the instant shipment. Do the factors which make for high costs and therefore high rates on incendiary bombs also call for a high rate on steel casings filled with napalm gel? To answer that question there must be close familiarity with these factors. Such familiarity is possessed not by the courts but by the agency which had the exclusive power to pass on the rate in the first instance." 352 U.S. at pages 66–67, 77 S.Ct. at page 166.

Defendant Eur-Pac argues that the Western Pacific decision is inapplicable because here the NC–5s were not classified as falling within the precise language of any tariff classification but rather fit into no established category and were classified by analogy. This rather increases than decreases the need for reference to the Commission to determine the applicable rating. Going back to the basic principles announced in Mr. Justice Brandeis' opinion in the Great Northern case, reference to the Commission is necessary whenever failure to make such a reference would prevent uniformity of treatment among shippers. Classifica-

tion by analogy affords fertile ground for that. Moreover, the very concept of classification by analogy presupposes an understanding of those factors which underlay the setting of different rates for various types of commodities. In order to ascertain whether the NC-5 is essentially more like an automobile chassis or a generator, or any other classified item, it is necessary to know which characteristics of chassis or of generators were considered relevant in the formulation of the tariff.

■ Plaintiff calls the Court's attention to Rule 15 of the tariff, which provides:

"When not specifically classified, articles which have been combined or attached to each other will be charged for at the rating for the highest classed article of the combination."

Asserting that the NC-5 is a combination of two generators (Class 5) and what it persists in calling a "motor vehicle chassis" (Class 1), plaintiff argues that under this rule a first-class rate should be applied. However, far from eliminating the necessity for expert judgment, the application of Rule 15 adds to the difficulty. In order to reach the plaintiff's conclusion it is necessary first to hold that the NC-5 possesses the essential characteristics of an automobile chassis, the term used in the tariff. The Court is unable to make that determination. As defendant Eur-Pac points out, it is far from clear that the possession of wheels, a frame and an engine is the essential characteristic of an automobile chassis; its intended use or perhaps its dimensions and weight may be of equal or greater significance. Lift trucks and other trucks or tractors used in warehousing, for example, though equipped with wheels, a frame and an engine, are given a fourth-class rating. To hold that the NC-5 is an automobile chassis, or a chassis combined with generators, and thus carries a first-class rating would be to declare it deserving of a rate four times that applicable to a lift truck or

tractor. Without more knowledge of the factors underlying the tariff classifications than I have, I cannot rule that such a difference in treatment would accord with the tariff or with the cost allocations reflected therein. See Northwestern Auto Parts Co. v. Chicago, B. & Q. R. Co., 8 Cir., 1957, 240 F.2d 743.

There is some suggestion by the defendants that plaintiff, having set the rate originally charged, should be estopped to assert at this later date that its classification was erroneous. This contention was disposed of in Judge Levet's memorandum decision of July 18, 1956, 19 F.R.D. 256, 259; as he said, "estoppel could not become the means for successfully avoiding the requirement of the Interstate Commerce Act" imposing a duty on the carrier to sue to recover undercharges which constitute violations of the statute. See Pennsylvania R. Co. v. Fox & London, Inc., 2 Cir., 1938, 93 F. 2d 669, 671, certiorari denied 1938, 304 U.S. 566, 58 S.Ct. 949, 82 L.Ed. 1532; National Carloading Corp. v. Atchison, T. & S. F. R. Co., 9 Cir., 1945, 150 F.2d 210, 212.

Defendant Consolidated makes the final assertion that the classification of the NC-5 in a later tariff to which the plaintiff was a party, adopted in 1956, obviates the necessity for a referral to the Commission, apparently on the theory that the Court may assume the principles which led to the classification of the NC-5 in the 1956 tariff were the same as those which determine its proper classification by analogy under the earlier tariff. Apart from all else, the inappropriateness of such an assumption is emphasized by the fact that, although the dispute in this case is whether the NC-5 should be given a first or a fourth-class rating, the 1956 tariff placed the NC-5 in a third-class category.

The plaintiff shall therefore apply to the Interstate Commerce Commission, on notice to the defendants, for a determination of the proper classification of the NC-5 under the tariff in force at the time of and relevant to the shipments in

**12**

question; and the action is stayed pending determination of such an application by the Commission.

It is so ordered.