**UNITED STATES of America,**
**Plaintiff,**

v.

**C. H. DAVENPORT, Defendant.**

**Civ. A. No. 73-211.**

United States District Court,
M. D. Pennsylvania.

March 6, 1974.

As Amended March 11, 1974.

Laurence M. Kelly, Asst. U.S. Atty., Scranton, Pa., Arthur F. Bronczyk, Philadelphia, Pa., for plaintiff.

William S. Kreisher, Bloomsburg, Pa., for defendant.

OPINION

MUIR, District Judge.

The Government brought this civil action for fines pursuant to § 222(h) of the Interstate Commerce Act, 49 U.S.C. § 322(h), charging Defendant with engaging in interstate operations without a certificate of public convenience and

necessity authorizing such operations, in violation of § 206(a) of the Act, 49 U. S.C. § 306(a). The case was tried by the Court without a jury on February 19 and 20, 1974.

The evidence presented at trial revealed the following facts: The Defendant has a Certificate of Public Convenience and Necessity, No. MC 133874, duly issued by the Interstate Commerce Commission on June 29, 1970, which provides authority for the following transportation service:

> "(1) Christmas trees, boughs, laurel roping, and greens, (2) products usually grown, manufactured, or sold by nurserymen and florists, when moving either to or from the facilities of nurserymen, florists, or their suppliers, and (3) materials, supplies, or equipment used by nurserymen and florists in connection with or incidental to the growth, manufacture, or sale of the products described in (2) above,
>
> Between points in Pennsylvania, on the one hand, and, on the other, points in the United States except Alaska and Hawaii."

Between January 11, 1971, and September 30, 1971, Defendant hauled fifteen shipments which included one or more of the following products: Sweeping compound, cardboard drums, metasilicate, sodium metasilicate, anhydrous metasilicate, silicate of soda, soda ash, glass lamp globes, and decorative chain. None of the consignor-shippers or the consignee-receivers involved in these shipments were nurserymen or florists. While some of them had, at one time or another, supplied nurserymen or florists with certain products, none of the products involved in the shipments in question were earmarked for ultimate usage by nurserymen or florists. For example, the soda ash and various forms of metasilicate were shipped to a manufacturer of dishwashing compound who in turn sold the dishwashing compound to the General Services Administration for dis-

tribution to government agencies. The same manufacturer also shipped sweeping compound to the G.S.A. via Defendant for the same purpose. The decorative chain and glass lamp globes were shipped via Defendant to a company for the manufacture of lamps for general distribution and sale.

As part of his defense, Defendant demonstrated to the satisfaction of the Court that commodities similar to those which are the subject of this action are used or sold by some florists or nurserymen in one form or another. Sweeping compounds are used in some florists shops to control dust. Cardboard drums are used to store certain chemicals needed in the florist trade, as well as to hold waste materials. Metasilicates are used in the manufacture of abrasive cleaners which nurserymen or florists might use in cleaning equipment. Soda ash is used to remove shading compound from greenhouse glass. Decorative chains are used to make hanging flower pots for sale in the retail florist market. And glass lamps are sold as such or used in flower displays by some florist shops. As can be observed, the connection between many of these products and the florist and nursery trade is attenuated at best. The commodities do not play a significant part in the florist and nursery trade, nor are they used predominantly by florists and nurserymen.

Against this factual background, Mr. Davenport raises several contentions in his defense. First, he argues that the shipments in question are covered by clause (2) of the certificate. The short answer to this is that, even if some of the shippers or receivers might arguably be considered "suppliers" of nurserymen or florists, the commodities involved are not "products usually grown, manufactured, or sold by nurserymen and florists."

Defendant next contends that the shipments are covered by clause (3) of the certificate in that they were "materials, supplies, or equipment used by nurserymen and florists in connection

with or incidental to the growth, manufacture, or sale of products described in (2) above." Defendant points to the absence in clause (3) of any limitation that such shipments must be moving "either to or from the facilities of nurserymen, florists, or their suppliers." Since some nurserymen and florists use in their business products similar to those in question, Defendant argues that the certificate clearly authorizes the shipments. In my view, such an interpretation of the certificate is unreasonable in that it would permit shipment of an almost limitless array of commodities, so long as similar commodities were used by some florists in any aspect of their business. The more reasonable interpretation would limit the shipment of products to those which are, in fact, destined to be used by nurserymen or florists. This interpretation has repeatedly been given to similar certificate language by the Interstate Commerce Commission pursuant to the so-called "intended use" test.

> "This Commission has granted numerous operating authorities which identify the commodities to be transported by reference to their intended future use. Outstanding in this group are the authorities granted to oilfield haulers; namely, "machinery equipment, materials, and supplies used in, or in connection with * * *", et cetera. This type of authority has been construed in various cases, among them England Transp. Co., Inc., Extension—Mississippi Points, 49 M.C.C. 567 (machinery, materials, supplies, and equipment, incidental to and used in the construction, development, operation, and maintenance of facilities for the discovery, development, and production of natural gas and petroleum); Greenberg—Investigation of Operations, 52 M.C.C. 25, 52 M.C.C. 387 (commodities used or useful in the manufacture of beds and brooms); Point Pleasant Transp. Co., Inc., Declaratory Order, 61 M.C.C. 666 (building materials); and Converse Extension—Construction Materials, 66 M.C.C. 607 (construction materials, equipment, and supplies)."

> "In general, the rule applied in construing authorities of this type is that the carrier may transport those commodities the predominant or sole use of which is confined to the particular activity specified in the authority without making an investigation as to the actual use to be made thereof, provided, of course, that it does not have knowledge that the particular commodities to be transported are not to be so used, but that it may transport those commodities which have general utility in many lines of work only if at the time of transportation they are, without further processing or manufacture, in a form and condition to be used in the particular activity specified in the authority and are at the time of transportation intended with reasonable certainty to be so used."

Hide and Skins Transportation Corp.— Interpretation of Certificate, 69 M.C.C. 657 (1957). See also Consolidated Freightways Corporation of Delaware v. Beeline Express, Inc., 108 M.C.C 481 (1969); Jack Cole Company, A Corporation v. T. T. Brooks Trucking Co., Inc., 105 M.C.C. 41 (1967); W. T. Mayfield Sons Trucking Co.,—Interpretations, 92 M.C.C. 167 (1963). The Commission's "intended use" test has been approved by the courts on numerous occasions. Beeline Express, Inc. v. United States, 308 F.Supp. 721, 726 (D.Colo.1970), and cases cited therein. In the case at bar, the Court has found that the commodities in question were not predominantly used by florists and nurserymen, nor was there any indication that they were to be so used. Therefore, under an "intended use" interpretation of Defendant's certificate, the Court would be compelled to find that Defendant made 15 interstate shipments without a certificate of public convenience and necessity authorizing such operations in violation of § 206(a) of the Interstate Commerce Act.

Defendant contends that since his certificate is capable of two interpreta-

tions, the Court, under the doctrine of "primary jurisdiction," is precluded from determining the issue prior to a determination by the Interstate Commerce Commission.

> " 'Primary jurisdiction' . . . applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views."

United States v. Western Pacific Railroad Co., 352 U.S. 59, 63–64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). *Western Pacific* presented the question of whether a tariff rate for "incendiary bombs" should be applied to shipments of napalm gel bombs which were not self-igniting. Both the construction and reasonableness of the tariff were in issue. The Supreme Court held that these were initially matters for agency determination because the "incendiary bombs" language of the tariff was used in a peculiar and technical sense and required extrinsic evidence to determine its meaning and proper application.

■ If the question of the interpretation of the "used by" language in clause (3) of Defendant's certificate were one of first impression, the Court might agree with Defendant's "primary jurisdiction" arguments and find that the language embraces a technical meaning within the expertise of the Commission. However, as noted in the *Western Pacific* case:

> "Certainly there would be no need to refer the matter of construction to the Commission if that body, in prior releases or opinions, has already construed the particular tariff at issue or has clarified the factors underlying it."

352 U.S. at 69, 77 S.Ct. at 168. See also Crancer v. Lowden, 315 U.S. 631, 62 S. Ct. 763, 86 L.Ed. 1077 (1942). As previously demonstrated, the Commission, while not interpreting the particular certificate in issue, has construed similar language in other certificates and has consistently adhered to its "intended use" doctrine. The Court is entitled to interpret the certificate in light of the unequivocal and reasonable position of the Commission in similar situations. See United States v. W. J. Dillner Transfer Co., 315 F.2d 107 (3d Cir. 1963). It would be a needless gesture to refer this certificate to the Commission for interpretation.

■ The Court finds that Defendant violated the provisions of 49 U.S.C. § 322(h) on fifteen separate occasions and is liable for a fine of up to $500.00 for each violation. While Defendant's contention that he made the illegal shipments upon his own good faith interpretation of the certificate does not go to the question of whether the statute was violated, the Court has considered this factor in determining the amount of the fine to be imposed. See United States v. Lake Shore Motor Freight Co., 363 F.Supp. 401 (N.D. Ohio 1973). Under the provisions of 49 U.S.C. § 322(h), the Court has determined that a fine of $50.00 for each violation is appropriate. The Court will order the clerk to enter judgment in favor of the Plaintiff for $750.00, together with costs.

This Opinion shall constitute the Court's findings of fact and conclusions of law.