Angela SANCHEZ–KNUTSON,
Plaintiff,

v.

FORD MOTOR COMPANY, Defendant.

Case No. 14–61344–CIV.

United States District Court,
S.D. Florida.

Signed Oct. 7, 2014.

Jordan Matthew Lewis, John Joseph Uustal, Kelley Uustal, PLC, Michael Aaron Hersh, Greenberg Traurig, Fort Lauderdale, FL, for Plaintiff.

Janet Conigliaro, Dykema, Detroit, MI, Joel A. Dewey, DLA Piper, LLP, Baltimore, MD, Edward Colin Thompson, J. Trumon Phillips, DLA Piper LLP, Tampa, FL, for Defendant.

## ORDER DENYING FORD'S MOTION TO DISMISS

WILLIAM P. DIMITROULEAS, District Judge.

THIS CAUSE is before the Court upon Defendant Ford Motor Company ("Ford" or "Defendant")'s Motion to Dismiss [DE 19]. The Court has carefully considered the Motion, Plaintiff Angela Sanchez–Knutson ("Plaintiff")'s Response [DE 23], Defendant's Reply [DE 25], arguments by counsel at the hearing on October 2, 2014, and is otherwise fully advised in the premises.

## I. BACKGROUND

This action arises out Ford's sale of Ford Explorer model vehicles[1] with an

---

1. While the Complaint [DE 1] states "Class Action Complaint," any arguments about whether this case can be properly maintained as a class action are premature at this stage

allegedly dangerous and defective condition that was allowing the exhaust and other gases to enter the passenger compartment of the vehicle during normal use.

According to the factual allegations of the Complaint, Plaintiff Angela Sanchez–Knutson ("Plaintiff") is a resident of Broward County, Florida. [DE 1] at & 10. Defendant Ford Motor Company ("Ford") is a Delaware corporation with its principal place of business in Michigan. ¶ 11.

On March 31, 2012, Plaintiff purchased a new 2013 Ford Explorer from an authorized Ford dealership in Gainesville, Florida. ¶ 12. The 2013 Ford Explorer purchased by Plaintiff was dangerous and defective when purchased because its design and exhaust and/or HVAC systems permitted an exhaust odor, exhaust and other gases, including carbon monoxide, to enter the passenger compartment of the vehicle. ¶ 13. This defect is latent in nature because it is not obvious or ascertainable upon reasonable examination or inspection. ¶ 13. At the time of the purchase, Plaintiff was not notified that the 2013 Ford Explorer she was purchasing was defective, nor was she notified that she and all occupants, including her husband and children, would be exposed to lethal carbon monoxide and other potentially dangerous gases while driving in her 2013 Ford Explorer during its normal and customary use. ¶ 14.

Plaintiff brought the vehicle in for service at an authorized Ford dealership in Sunrise, Florida, on or about the following dates: September 12, 2012, November 29, 2012, March 20, 2013, August 20, 2013, November 7, 2013, January 7, 2014, March 13, 2014, and April 14, 2014. ¶ 15. Each time, Plaintiff or her husband notified the authorized Ford dealership that an exhaust odor was present in the passenger compartment while the vehicle was in use, and that the odor would intensify when the driver accelerated the vehicle. ¶ 16.

When the vehicle was brought in for service on or about November 7, 2013, the authorized Ford dealership verified Plaintiff's complaint of an exhaust odor in the passenger compartment of the vehicle. ¶ 17. The authorized Ford dealership prescribed and performed TSB 12–12–4, which was intended to correct the problem. ¶ 17. However, Plaintiff continued to smell exhaust in the passenger compartment of the vehicle after TSB 12–12–4 was performed. ¶ 18. Plaintiff or her husband continued to notify the authorized Ford dealership on each service visit that an exhaust odor was present in the passenger compartment of the vehicle while the vehicle was in use. ¶ 18.

The authorized Ford dealership informed Plaintiff that Ford was aware of the exhaust odor problem but did not know how to fix the problem. ¶ 19. An employee or agent of the authorized Ford dealership informed Plaintiff that the wife of the owner of the authorized Ford dealership drove a Ford Explorer and had experienced the same problem as Plaintiff—an exhaust odor in the passenger compartment of the vehicle. ¶ 20.

Carbon monoxide is a colorless, odorless and tasteless gas that is toxic to humans. ¶ 22. On numerous occasions, Plaintiff or her husband asked the authorized Ford dealership whether the exhaust odor problem posed a health risk, including whether carbon monoxide was entering the passenger compartment of the vehicle. ¶ 21. The authorized Ford dealership assured Plaintiff that there was no carbon monoxide entering the passenger compartment of the vehicle, and that the problem was not a

in the litigation. No responsive pleadings have been filed. No discovery has occurred.

*See* Order Denying Without Prejudice Plaintiff's Motion for Class Certification. [DE 20].

hazard to health. ¶ 23. Based upon those representations, Plaintiff continued to operate the vehicle. ¶ 24. In or about April 2014, Plaintiff learned that lethal quantities of carbon monoxide would enter the passenger compartment of the vehicle while the vehicle was being driven in a normal and customary manner. ¶ 25. Plaintiff immediately discontinued operating the vehicle. ¶ 25.

The 2011 through 2013 model year Ford Explorers were designed, engineered and manufactured by Ford with design flaws and/or defective exhaust and/or HVAC systems that permit carbon monoxide and exhaust to enter into the passenger compartments of those vehicles while being driven in a normal and customary manner. ¶ 30. Ford knew or should have known that the 2011 through 2013 model year Ford Explorers were dangerous and defective such that drivers and passengers of those vehicles may be exposed to carbon monoxide and other dangerous gases while the vehicles are in operation. ¶ 32. As of the date of filing the Complaint, Ford has not repaired Plaintiff's 2013 Ford Explorer. ¶ 26. Nor has Ford acknowledged that the 2011–2013 model year Ford Explorers contain design flaws and/or defective exhaust and/or HVAC systems permitting lethal carbon monoxide and other potentially dangerous gases into the passenger compartments of those vehicles. ¶ 26.

Ford designed, manufactured, assembled, inspected, distributed, sold and leased the 2011 through 2013 model year Ford Explorers in a manner so as to render the subject vehicles defective and unsafe for their intended use and purpose by, among other things:

(a) Designing the vehicles such that exhaust and other gases, including carbon monoxide, may enter the passenger compartments of the vehicles;

(b) Designing the bumpers and/or tailpipes on the vehicles such that exhaust and other gases, including carbon monoxide, may accumulate behind the bumper and within the interior and exterior panels, allowing those gases to permeate the passenger compartments of the vehicles;

(c) Designing, manufacturing and assembling the vehicles using defective rear air extractors which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles;

(d) Designing, manufacturing and assembling the liftgates in the rear of the vehicles using defective drain valves, which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles;

(e) Designing, manufacturing and assembling the vehicles with sheet metal panels and overlaps which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles;

(f) Designing, manufacturing and assembling the vehicles with rear auxiliary air conditioning system parts which are defectively designed and/or located too close in proximity to the driver side rear air extractor, such that exhaust and other gases, including carbon monoxide, may enter the auxiliary air conditioning system and the passenger compartments of the vehicles.

¶ 31.

The defective vehicles were sold or leased pursuant to express and implied warranties. ¶ 33. These warranties assured consumers that the vehicles were

free from defects and were properly equipped for the use for which they were intended. ¶ 33. At the time the defective vehicles were sold or leased by Ford directly and through its authorized agents, the vehicles were in violation of express and implied warranties. ¶ 33. All of the defective vehicles are still within the dates of the express written warranties, or the time or mileage limits in the express warranties should be inapplicable given Ford's conduct related to these vehicles. ¶ 33.

In promoting, selling, and repairing its defective vehicles, Ford acts through numerous authorized dealers who act, and represent themselves to the public, as exclusive Ford representatives and agents. ¶ 34. That the dealers act as Ford's agents is demonstrated by the following facts:

(a) The warranties provided by Ford for the defective vehicles directs consumers to take their vehicles to authorized dealerships for repairs or services;

(b) Ford dictates the nature and terms of the purchase contracts entered into between its authorized dealers and consumers;

(c) Ford directs its authorized dealers as to the manner in which they can respond to complaints and inquiries concerning defective vehicles; and

(d) Ford has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers and the dealers' interaction with the public.

(e) Ford implemented its express and implied warranties as they relate to the defects alleged herein by instructing authorized Ford dealerships to address complaints of an exhaust odor by prescribing and implementing TSB 12–12–4. ¶¶ 34, 35.

In or about December of 2012, Ford issued TSB 12–12–4 in response to customer complaints of an exhaust odor in the passenger compartments of the subject vehicles. ¶ 36. TSB 12–12–4 was intended to provide instructions to authorized Ford dealerships to correct the presence of an exhaust odor in 2011 through 2013 model year Ford Explorers. ¶ 36. TSB 12–12–4 does not identify a specific fix to the exhaust odor problem. ¶ 40. Rather, TSB 12–12–4 requires various replacements and/or repairs to several unrelated vehicle parts. ¶ 40. This demonstrates that Ford knew of the defect, but did not know of a specific, effective fix to protect occupants of the 2011 through 2013 model year Ford Explorers from exhaust and other gases, including carbon monoxide. ¶ 40. Ford issued TSB 12–12–4 hoping, but not knowing, that any one of the various replacements and/or repairs identified therein would remedy the exhaust odor complaints. ¶ 40.

TSB 12–12–4 fails to repair the exhaust odor problem, and vehicles which have received the repairs outline in TSB 12–12–4 may continue to have exhaust and other gases, including carbon monoxide, enter the passenger compartment. ¶ 41. TSB 12–12–4 identifies flaws in the initial design and manufacture of the 2011 through 2013 model year Ford Explorer, and prescribes repairs and/or replacements which are inadequate and equally flawed and defective. ¶ 42. In TSB 12–12–4, Ford requires installation or use of the following replacement parts in the subject vehicles, among others: (i) a dual rate air extractor; (ii) valve assembly auto drains; and (iii) Motorcraft Seam sealer. ¶ 43.

TSB 12–12–4 requires that the dual rate air extractor replace the driver side rear

air extractor initially installed on the subject vehicle. ¶ 44. The rear extractor initially installed on the subject vehicle was dangerous and defective because it permitted exhaust and other gases, including carbon monoxide, to permeate the exterior panels of the subject vehicles and enter the passenger compartment. ¶ 44. Ford requires the replacement of the driver side rear air extractor, and not the passenger side rear extractor, because the air intake from the auxiliary air condition system is situated dangerously close in proximity to the driver side rear air extractor. ¶ 44. The placement of the air intake system too close to the rear air extractor allows exhaust and other gases, including carbon monoxide, to enter the auxiliary air condition system. ¶ 44. The replacement part—a dual rate air extractor—is formed of polypropylene and overmolded with thermoplastic elastomer (TPE). ¶ 45. The dual rate air extractor has a listed purchase price of $86.33, whereas the initially installed air extractor has a listed purchase price of $22.50. ¶ 46. However, the dual rate air extractor fails to prevent exhaust and other gases, including carbon monoxide, from entering the auxiliary air condition systems and the passenger compartment of the subject vehicles. ¶ 46. The replacement dual rate air extractors are therefore ineffective, dangerous and defective. ¶ 46.

The dual rate air extractor used as a replacement part per TSB 12–12–4 includes "living hinges" and plastic torsional springs that are meant to function as a one-way pneumatic valve. ¶¶ 45, 47. Per TSB 12–12–4, Ford modifies the dual rate air extractors by haphazardly adding a silicone-like white substance to the uppermost of the three "living hinges." ¶ 47. This silicone-like white substance is not included, and was not meant to be included, as part of the dual rate air extractor as designed by its manufacturer. ¶ 47. More-over, the silicone-like white substance added by Ford to the dual rate air extractor causes the "living hinges" to remain open, permitting exhaust and other gases to permeate the exterior panels of the vehicles, and enter the passenger compartment. ¶ 47.

Ford designed, manufactured and engineered the 2011 through 2013 model year Ford Explorers using valve assembly auto drains on the rear liftgate of the vehicles, which are dangerous and defective because the parts permit exhaust and other gases, including carbon monoxide, to enter the passenger compartment. ¶ 48. The replacement valve assembly auto drains fail to prevent exhaust and other gases, including carbon monoxide, from entering the passenger compartment and, thus, they are ineffective, dangerous and defective. ¶ 48.

Ford designed, manufactured and engineered the 2011 through 2013 model year Ford Explorers without properly sealing the horizontal sheet metal lap joints on the left and right sides of the underbody of the subject vehicles. ¶ 49. Ford also designed, manufactured and engineered the 2011 through 2013 model year Ford Explorers without properly sealing the rear metal overlap flange across the rear of the vehicle, and the auxiliary air conditioning lines. ¶ 49. Accordingly, TSB 12–12–4 requires that the foregoing joints, flange and lines be sprayed with "generous amounts" of rubberized undercoating, and seam sealer. ¶ 49. However, the rubberized undercoating and seam sealer fail to prevent exhaust and other gases, including carbon monoxide, from entering the passenger compartment. ¶ 49.

Despite issuing TSB 12–12–4, Ford did not inform Plaintiff of the defects in 2011 through 2013 model year Ford Explorers, even though those defects presented life

safety issues to occupants of the vehicles. ¶ 37. In particular, TSB 12–12–4 fails to disclose that the exhaust odor acknowledged therein is accompanied in the passenger compartment by lethal carbon monoxide. ¶ 38. Ford has failed to inform customers who purchased and/or leased 2011 through 2013 model year Ford Explorers that they are unsafe for operation or that they were designed, engineered and manufactured such that exhaust and other gases, including carbon monoxide, may enter the passenger compartments of such vehicles. ¶ 39.

Plaintiff has been damaged by Ford's conduct and/or inaction. ¶ 50. Plaintiff has been exposed to harmful carbon monoxide and exhaust, has unknowingly purchased a defective vehicle which cannot be safely operated, and has been forced to pay, or will pay, substantial amounts of money to repair the vehicle, if a repair can be made. ¶ 50. A vehicle containing the defect described in the Complaint, *i.e.,* that permits the entry of carbon monoxide and other gases into the passenger compartment of the vehicle, is worth less that a vehicle free from such defect. ¶¶ 50, 51. Given that the defect renders driving the subject vehicle a health hazard which is potentially deadly, the vehicle is valueless. ¶ 51. However, when Plaintiff purchased the vehicle she paid a price based upon the value of such a vehicle free of such defect. ¶ 51.

## II. *DISCUSSION*

### A. Motion to Dismiss Standard

Until the Supreme Court decision in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), courts routinely followed the rule that, "a complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff could prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). However, pursuant to *Twombly,* to survive a motion to dismiss, a complaint must now contain factual allegations which are "enough to raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." 550 U.S. at 555, 127 S.Ct. 1955. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations ... a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* Taking the facts as true, a court may grant a motion to dismiss when, "on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Marshall Cty. Bd. of Educ. v. Marshall Cty. Gas Dist.,* 992 F.2d 1171, 1174 (11th Cir.1993). In *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009), the Supreme Court further stated that a court need not accept legal conclusions as true, but only well-pleaded factual allegations are entitled to an assumption of truth.

### B. Ford's Motion to Dismiss

Based upon the foregoing allegations, Plaintiff alleges the following four claims against Ford: Count I—Violation of the Magnuson–Moss Warranty Act, 15 U.S.C. § 2301 *et seq.;* Count II—Violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 et seq. ("FDUTPA"); Count III—Breach of Express Warranty, Fla. Stat. § 672.313; and Count IV—Breach of Implied Warranty, Fla. Stat. § 672.313. Ford has moved to dismiss the Complaint in its entirety, with prejudice. The Court will consider Ford's arguments as to each of the four claims,

although in a different order than pled in the Complaint.

### 1. Breach of Express Warranty, Fla. Stat. § 672.313 (Count III)

#### a. The Court will consider the Warranty Guide

In its motion to dismiss the breach of express warranty claim, Ford relies on the 2013 Model Year Ford Warranty Guide (the "Warranty Guide"), which it attaches to its Motion. See [DE 19–2]. In response, Plaintiff argues that Ford's argument impermissibly relies on materials outside the Complaint.

██ Here, the Court may consider the Warranty Guide when ruling on its motion to dismiss Count III of the Complaint—breach of express warranty—because (1) the terms of the Warranty Guide are central to Plaintiff's breach of express warranty claim, as they provide the basis for the claim itself, (2) Plaintiff references the express written warranty in her Complaint, and (3) Plaintiff does not challenge the authenticity of the Warranty Guide attached to the motion to dismiss. See Day v. Taylor, 400 F.3d 1272, 1276 (11th Cir.2005) (holding that court may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if (1) the contents of the attached document are central to the plaintiff's claim and (2) the authenticity of the document is not challenged.). This Court's ruling in Rosen et al. v. J.M. Auto et al., case no. 07–cv–61234–WPD (March 6, 2008), in which the Court declined to consider the warranty documents, is distinguishable from the present case because in Rosen, the plaintiffs disputed the authenticity of the warranty documents, and there was a dispute as to when the warranty documents were issued.

Moreover, the Court's analysis of whether Plaintiff has plausibly alleged a claim for breach of express warranty will involve consideration of the terms of the warranty upon which that claim is based, as such a claim is governed by the language of the express warranty that is alleged to have been breached. See Cipollone v. Liggett Group, Inc., 505 U.S. 504, 525, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) ("A manufacturer's liability for breach of an express warranty derives from, and is measured by, the terms of that warranty."). See also Aprigliano v. American Honda Motor Co., Inc., 979 F.Supp.2d 1331, 1334 n. 2 (S.D.Fla.2013) (ruling court would consider the written Warranties that the manufacturer attached to its motion to dismiss "because they are referenced in Plaintiffs' Amended Complaint, are central to the dispute, and their contents are not in dispute.")

#### b. Plaintiff states a claim for breach of express warranty

The elements of a cause of action for a breach of warranty under Florida law are:

(1) Facts in respect to the sale of the goods;

(2) Identification of the types of warranties created, i.e. express warranty (Section 672.313, Florida Statutes); implied warranty of merchantability (Section 672.314, Florida Statutes); implied warranty of fitness for a particular purpose (Section 672.315, Florida Statutes);

(3) Facts in respect to the creation of the particular warranty. For example, in the case of an implied warranty of fitness for a particular purpose, the complaint should allege that the seller had reason to know the particular purpose for which the goods were purchased by the buyer and that the buyer relied on the seller's judgment in providing suit-

able goods. Section 672.315, Florida Statutes;

(4) Facts in respect to the breach of the warranty;

(5) Notice to seller of breach. Section 672.607(3)(a), Florida Statutes;

(6) The injuries sustained by the buyer as a result of the breach of warranty. *Sparger v. Newmar Corp.*, 2014 WL 3928556, *6 (S.D.Fla. Aug. 12, 2014) (citing *Davis v. Ford Motor Co.*, 63 UCC Rep.Serv.2d 445 (S.D.Fla.2007) (citing *Dunham–Bush, Inc. v. Thermo–Air Service, Inc.*, 351 So.2d 351 (Fla. 4th DCA 1977))).

■ Pursuant to Section 672.313, Florida Statutes:

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that the seller have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

Fla. Stat § 672.313. "Under this state's law, there can be no cause of action for breach of an express limited warranty unless the consumer can allege and prove that the manufacturer did not comply with the limited express warranty's terms." *Ocana v. Ford Motor Co.*, 992 So.2d 319, 324 (Fla. 3d DCA 2008) (citing § 672.313, Fla. Stat.). Thus, the language of the Warranty Guide sets forth the scope of the express warranties made by Ford. *See* [DE 19–2].

■ Ford argues that Plaintiff cannot state a claim for breach of express warranty because—according to Ford—Plaintiff's claim is for a design defect only, and—according to Ford—the terms of the Warranty Guide expressly excludes warranty coverage for claims of a design defect. The Court disagrees. First, Ford's position is premised on narrowing Plaintiff's claims to that of a design defect only theory. However, Plaintiff has alleged, in her Complaint, defective manufacture, defective assembly, defective engineering, and defecting inspection. *See* [DE 1] at ¶¶ 30, 31, 48, 49. Moreover, notwithstanding Ford's argument that its Warranty Guide expressly excludes warranty coverage for claims of a design defect, there is in fact no such limitation. Pursuant to the language of the Warranty Guide:

Your NEW VEHICLE LIMITED WARRANTY gives you specific legal rights. You may have other rights that vary from state to state. Under your New Vehicle Limited Warranty if:

—your Ford vehicle is properly operated and maintained, and

—was taken to a Ford dealership for a warranted repair during the warranty period, then authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable

coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship. **This warranty does not mean that each Ford vehicle is defect free. Defects may be unintentionally introduced into vehicles during the design and manufacturing processes and such defects could result in the need for repairs. For this reason, Ford provides the New Vehicle Limited Warranty in order to remedy any such defects that result in vehicle part malfunction or failure during the warranty period.** The remedy under this written warranty, and any implied warranty, is limited to repair, replacement, or adjustment of defective parts. This exclusive remedy shall not be deemed to have failed its essential purpose so long as Ford, through its authorized dealers, is willing and able to repair, replace, or adjust defective parts in the prescribed manner. Ford's liability, if any, shall in no event exceed the cost of correcting manufacturing defects as herein provided and upon expiration of this warranty, any such liability shall terminate.

*See* [DE 19–2] at pp. 8–9 (emphasis added). Additionally, the list in the "what is not covered" section does not state that design defects are not covered. *See* [DE 19–2] at p. 12. The Court concludes that design defects are covered by Ford's express warranty. Moreover, to the extent that the language is ambiguous regarding whether design defects are covered, that ambiguity is construed against Ford, the drafter. *See Citro Florida, Inc. v. Citrovale, S.A.*, 760 F.2d 1231, 1232 (11th Cir. 1985).

Based upon the foregoing, Ford's motion to dismiss Plaintiff's breach of express warranty claim (Count III) shall be denied.[2]

### 2. Breach of Implied Warranty, Fla. Stat. § 672.313 (Count IV)

In Count IV, Plaintiff alleges that Ford impliedly warranted that the subject vehicles were merchantable, fit for the ordinary purposes for which they were intended to be used, and were not otherwise injurious to consumers. Plaintiff further alleges that Ford breached its implied warranty of merchantability when it designed, manufactured, distributed, sold and leased the 2011 through 2013 model year Ford Explorers in an unsafe and unmerchantable condition, as the subject vehicles threaten to expose occupants to carbon monoxide and other dangerous gases while the vehicles are being driven in a normal and customary manner. *See* [DE 1] at ¶¶ 104–105. Ford argues that the Court must dismiss this claim on the grounds that Plaintiff cannot recover on a breach of implied warranty claim under Florida laws because she was not in privity with Ford, as Plaintiff purchased her vehicle from an authorized Ford dealership, not from Ford.

Ford relies heavily on *Mesa v. BMW of North America*, 904 So.2d 450, 458 (Fla. 3rd DCA 2005) ("Under Florida law, a plaintiff cannot recover economic losses for breach of implied warranty in the absence of privity."). In *Mesa*, the plaintiff leased a car from dealer South Motors and was issued a warranty that ran from warrantor BMW to the first retail purchaser and each subsequent purchaser. The court held that the plaintiff could pursue an express warranty claim against warrantor BMW, but that the plaintiff "cannot maintain suit against BMW for breach of im-

---

**2.** As Plaintiff has stated a claim for breach of express warranty for both design defect and manufacturing defect, the Court need not consider Ford's arguments attempting to distinguish a design defect theory from other defects in this case.

plied warranty as there was no privity of contract between Mesa and BMW." *id.* at 458. Relying on *Mesa,* other federal district courts have dismissed implied warranty claims because there was no privity of contract between the purchaser plaintiff and the defendant vehicle manufacturer. *See David v. American Suzuki Motor Corp.,* 629 F.Supp.2d 1309, 1323 (S.D.Fla. 2009) (dismissing plaintiff's claim for breach of implied warranty under Florida law because "Plaintiff David has not established privity with Defendants American Suzuki and Suzuki Japan"); *McCabe v. Daimler AG,* 948 F.Supp.2d 1347 (N.D.Ga. 2013) (dismissing breach of implied warranty claims in the absence of privity). *Mesa* relied on and cited to the Florida Supreme Court's opinion in *Kramer v. Piper Aircraft Corp.,* 520 So.2d 37 (Fla. 1988). In *Kramer,* the Florida Supreme Court held that an implied warranty claim for personal injury no longer exists under Florida law absent privity, as that cause of action was abolished in favor of the doctrine of strict liability in those instances in which a cause of action for strict liability is appropriate. *Id.* at 39–40.

In opposition, Plaintiff contends that the Florida Supreme Court holdings in *Manheim v. Ford Motor Co.,* 201 So.2d 440, 441 (Fla.1967) and *Kramer* can coexist, and that *Manheim* remains good law. In *Manheim,* the plaintiff purchased a defective vehicle from a dealership. The Florida Supreme Court held that neither the absence of privity between the manufacturer and purchaser nor the disclaimer of warranty between the manufacturer and dealership precluded an implied warranty claim by the purchaser against the manufacturer. *Id.* at 441. Here, Plaintiff argues that Florida law does not require privity in this context to plead a breach of implied warranty claim. She highlights a recent District of New Jersey decision, *Morano v. BMW of North America, LLC,*

928 F.Supp.2d 826 (D.N.J.2013). In that case, the in the context of an express warranty claim under Florida law, the district court held that strict privity requirements made no sense in the relationship between the vehicle manufacturer and the vehicle purchaser, who "function as an integrated, two-part seller (or lessor)." *Id.* at 837. Plaintiff argues that this logic should also apply to the implied warranty claim, where Ford has structured its sales so as to seemingly insulate itself from the intended vehicle purchasers' implied warranty of merchantability claims.

Ford contends that Plaintiff's reliance on *Manheim* is misplaced, as *Manheim* has been effectively overruled. *See, e.g., In re Masonite Corp. Hardboard Siding,* 21 F.Supp.2d 593 (E.D.La.1998) ("Although plaintiff relies on *Manheim v. Ford Motor Co.,* 201 So.2d 440, 441–42 (Fla. 1967), for the proposition that privity is not required on warranty claims, plaintiff is mistaken. Although not expressly overruled, insofar as the *Manheim* decision jettisons the privity requirement it has been effectively overruled by *Kramer,* 520 So.2d 37, and its progeny.").

While the Florida Supreme Court may very well explain in the future that *Kramer* has not effectively overruled *Manheim,* the best indication for this Court at the present of what the Florida Supreme Court would decide is the Third District Court of Appeal's holding in *Mesa,* that, "[u]nder Florida law, a plaintiff cannot recover economic losses for breach of implied warranty in the absence of privity." 904 So.2d at 458.

■ Nevertheless, that is not the end of the analysis. While the legal theory itself was not spelled out in the Complaint, based upon the allegations pled in the Complaint, Plaintiff can pursue a claim of breach of implied warranty through third-

party beneficiary law. *See* [DE 1] at ¶¶ 34, 35, 71. "Literal privity can be finessed by a proxy: direct beneficiary or third-party beneficiary status." *In re Masonite Corp. Hardboard Siding*, 21 F.Supp.2d 593, 599 (E.D.La.1998) (citing *Warren v. Monahan Beaches Jewelry Ctr., Inc.*, 548 So.2d 870 (Fla. 1st DCA 1989)). *See also* 13 Richard A. Lord, *Williston on Contracts* § 37:39 at 259–60 (4th ed. 2000) ("In an appropriate case, . . . straightforward traditional third party beneficiary analysis can be successfully used to impose liability on a warrantor not in privity with a purchaser.") In *In re Toyota Motor Corp.*, 754 F.Supp.2d 1145, 1185 (C.D.Cal. 2010), a case relied on by both Plaintiff and Ford in this action, the court held:

> Here, Plaintiffs have pled that they purchased vehicles from a network of dealers who are agents of Defendants. (See ¶¶ 77–78.) Like the plaintiffs in Gilbert, Cartwright, and In re Sony VAIO, Plaintiffs allege they were the intended consumers. (See ¶ 363 ("The dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.").) Like those plaintiffs, they allege facts tending to support that they are third-party beneficiaries; therefore, Plaintiffs' breach of implied warranty claim is not precluded by the lack of vertical privity.

754 F.Supp.2d at 1185. Plaintiff makes similar allegations in her Complaint. *See, e.g.*, [DE 1] at ¶ 71 ("Plaintiff and each of the members of the class have had sufficient direct dealings with either Ford or its agent dealerships to establish privity of contract between Ford, on one hand, and Plaintiff and each of the members of the class, on the other hand. Notwithstanding, plaintiff and each of the members of

the class are the intended beneficiaries of Ford's express and implied warranties. The dealers were not intended to be the ultimate consumers of the subject vehicles, and have no rights under the warranty agreements provided by Ford. Ford's warranties were designed for and intended to benefit the consumers only.")

Based upon the foregoing, Ford's motion to dismiss Plaintiff's breach of implied warranty claim (Count IV) shall be denied.

### 3. Magnuson–Moss Warranty Act, 15 U.S.C. § 2301 et seq. ("MMWA") (Count I)

As Plaintiff's claims for violation of MMWA are generally derivative of Plaintiff's breach of express and implied warranty claims, the parties agree that Plaintiff's MMWA claim shall proceed in the event the Court denies dismissal of the warranty claims. Nonetheless, the Court must address Ford's remaining argument for dismissal of the MMWA claim, which relies exclusively on the issue of exhaustion.

The statutory language of the MMWA provides that if a warrantor has established an informal dispute settlement procedure that is incorporated into its written warranty, then "(i) the consumer may not commence a civil action (other than a class action) under subsection (d) of this section unless he initially resorts to such procedure; and (ii) a class of consumers may not proceed in a class action under subsection (d) . . . unless the named plaintiffs (upon notifying the defendant that they are named plaintiffs in a class action with respect to a warranty obligation) initially resort to such procedure." 15 U.S.C. § 2310(a)(3).

Ford argues that participation in BBB AUTOLINE is an absolute pre-condition to bringing a claim under MMWA. Ford

points to the provision of its Warranty Guide that states:

> You are required to submit your warranty dispute to the BBB AUTO LINE before exercising rights or seeking remedies under the Federal Magnuson–Moss Warranty Act, 15 U.S.C. 2301 *et seq.*

*See* [DE 19–2] at p. 7.

Ford asserts that the MMWA claim should be dismissed for failure to allege that Plaintiff satisfied the statutory conditions precedent to bringing a suit against Ford under the MMWA. In opposition, Plaintiff contends that she is not required to plead exhaustion, but rather that the informal dispute resolution program is an exhaustion requirement which Ford must plead as an affirmative defense.

Ford cites to a state court case, *Mady v. DaimlerChrysler Corp.*, 59 So.3d 1129 (Fla.2011), which addressed whether a consumer who resolves a legal action with a warrantor pursuant to Florida's offer of judgment statute constitutes a prevailing party under the MMWA and may recover attorneys' fees. Ford also relies on *Davis v. Southern Energy Homes, Inc.*, 305 F.3d 1268 (11th Cir.2002). In *Davis*, the Eleventh Circuit held that the MMWA permits the enforcement of valid binding arbitration agreements within written warranties. However, nowhere in *Mady* or *Davis* do the courts discuss whether exhaustion of the informal dispute program is a pleading requirement or an affirmative defense for an MMWA claim. Ford also cites *In re Toyota Motor Corp.*, 754 F.Supp.2d 1145 (C.D.Cal.2010) as support for its position. That reliance is misplaced. In *In re Toyota*, the defendants argued—like Ford in this case—that the MMWA claims must be dismissed to the extent they were asserted by plaintiffs who failed to avail themselves of the vehicle manufacturer's informal dispute resolution procedures as required by

15 U.S.C. § 2310(a). *See id.* at 1188. However, the court rejected the manufacturer's argument and did not dismiss the MMWA claims, instead holding that Plaintiffs' allegations allowed for an inference that the informal dispute settlement procedure put in place by the manufacturer were futile. *Id.* at 1189. Additionally, in *TGB Marine, LLC v. Midnight Express Power*, 2008 WL 3889578 (S.D.Fla. Aug. 20, 2008), the court did not dismiss any claims, but rather the court compelled arbitration of some claims and stayed other claims. Nowhere in *TGB Marine* does the district court discuss whether exhaustion of the informal dispute program is a pleading requirement or an affirmative defense for an MMWA claim. The only case cited by Ford in which a court dismissed a MMWA claim for failure to plead the requirements of 15 U.S.C. § 2310 is *Kearney v. Hyundai Motor Co.*, 2010 WL 9093204, *6 (C.D.Cal. Jun. 4, 2010). In that case, the district court addressed this issue summarily, cited no authority other than the statute to support that dismissal was appropriate, and did not address any argument that the informal dispute resolution program is an exhaustion requirement which the manufacturer must plead as an affirmative defense.

■ Upon consideration of the relevant authority, the Court agrees with Plaintiff that failure to participate in Ford's informal dispute settlement procedure is an affirmative defense—subject to waiver, tolling, and estoppel, that Ford may raise, not that Plaintiff must negate in her Complaint. In *Jones v. Bock*, 549 U.S. 199, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007), the Supreme Court held that where a statute imposes exhaustion but is "silent on the issue [of] whether exhaustion must be pleaded or is an affirmative defense, is strong evidence that the usual practice should be followed, and the practice under

the Federal Rules is to regard exhaustion as an affirmative defense." 549 U.S. at 200, 127 S.Ct. 910. Federal courts have applied the rule that failure to exhaust is an affirmative defense and not a jurisdictional defense in a variety of contexts, including cases involving ERISA, *Paese v. Hartford Life and Acc. Ins. Co.*, 449 F.3d 435, 445–46 (2nd Cir.2006); the Prison Litigation Reform Act, *Richardson v. Goord*, 347 F.3d 431, 434 (2nd Cir.2003); the Telecommunications Act, *Ohio Bell Tel. Co., Inc. v. Global Naps Ohio*, 540 F.Supp.2d 914, 921 (S.D.Ohio 2008); the Labor Management Reporting and Disclosure Act, *Knight v. International Longshoremen's Ass'n*, 457 F.3d 331, 344 (3rd Cir.2006); and the Individuals with Disabilities Education Act, *Mosely v. Board of Educ. of City of Chicago*, 434 F.3d 527 (7th Cir. 2006).

While participation in Ford's informal dispute settlement procedure is a prerequisite to being able to proceed with her MMWA claim, whether or not it already occurred is an issue of fact that is premature at this stage. At summary judgment, the Court may consider evidence of whether the procedure is resolved in the short term and the MMWA claim repled, whether Ford's program fits within the statutory criteria, whether Plaintiff is able to demonstrate evidence of futility, and other issues not appropriate when ruling on a motion to dismiss.

Based upon the foregoing, Ford's motion to dismiss Plaintiff's MMWA claim (Count I) shall be denied.

### 4. Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 et seq. ("FDUTPA") (Count II)

In Count II, Plaintiff asserts a claim against Ford for violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 *et seq.* The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" *Id.* § 501.204(1). The FDUTPA's purpose is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." *Id.* § 501.202(2). A practice is unfair if it "offends established public policy" or is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla.2003) (internal quotation marks omitted).

Based upon the factual allegations alleged in the Complaint, *see supra*, Plaintiff claims that Ford violated FDUTPA by:

—Failing to disclose that 2011 through 2013 model year Ford Explorers were defective such that an exhaust odor would enter the passenger compartments of those vehicles and that carbon monoxide and/or other dangerous gases were entering the passenger compartment of such vehicles, which defects Ford knew or should have known, in violation of the TREAD Act, 49 U.S.C. § 30101 *et seq.;*

—Directly, and through its salespeople and agents, continuing to inform potential purchasers of Ford Explorer vehicles that those vehicles are safe and fit for the use for which they were intended;

—Providing, disseminating, marketing, and otherwise distributing uniform false and mis-

leading advertisements, technical data and other information to consumers regarding the performance, reliability, quality, and nature of the subject vehicles;

—Representing that goods or services were of a particular standard, quality or grade, when they were of another;

—Engaging in unconscionable commercial practices by failing to reveal material facts and information about the subject vehicles, which did, or tended to mislead Plaintiff about facts that could not be reasonably be known by the consumer;

—Causing Plaintiff to suffer a probability of confusion and a misunderstanding of legal rights, obligations and/or remedies by and through its conduct;

—Failing to reveal material facts to Plaintiff with the intent that Plaintiff rely upon the omission;

—Making material representations and statements of fact to Plaintiff that resulted in Plaintiff reasonably believing the represented or suggested state of affairs to be other than what they actually were;

—Knowing of the exhaust and carbon monoxide problem, but failing to disclose its existence or its complete nature, even though Ford has known that such information was material to, among other things, those transactions in which Plaintiff purchase the subject vehicles and her decision to continue operating the vehicle;

—Continuing to sell or lease the subject vehicles without informing buyers or lessees of the defects in the vehicles.

*See* [DE 1] at ¶¶ 80–84.[3]

Ford moves to dismiss the FDUTPA claim on several grounds: (1) the reporting obligations under TREAD or the Safety Act cannot serve as the predicate of a FDUTPA claim; (2) there is no private right of action for a violation of the TREAD Act or the Safety Act; (3) the doctrine of primary jurisdiction demands dismissal; and (4) Plaintiff fails to allege sufficient supporting facts to meet the pleading requirements of *Twombly* and *Iqbal.*

First, Ford argues that the reporting obligations under TREAD or the National Traffic and Motor Vehicle Safety Act ("Safety Act"), 49 U.S.C. §§ 30118 *et seq.* cannot serve as a predicate for a FDUTPA claim. Ford asserts that merely because a statute or rule provides consumer protection does not mean that it will automatically provide the basis for a FDUTPA claim.[4]

---

**3.** Plaintiff's FDUTPA claim originally sought damages and an order requiring Ford to recall the subject vehicles, but Plaintiff has since dropped her demand for a recall.

**4.** Ford cites *In re Edgewater by the Bay, LLLP,* 419 B.R. 511, 516 (Bkrtcy.S.D.Fla.2009) ("Violations of laws or statutes that give rise to a FDUTPA claim must be of the kind that pro-

scribe unfair trade practices or unfair methods of competition; not, as the Counterclaimants suggest, a violation of any law or statute that may have some benefit to consumers."); *Double AA Intern. Inv. Group, Inc. v. Swire,* 674 F.Supp.2d 1344 (S.D.Fla.2009) (holding that violations of statutes that are not designed to proscribe unfair or deceptive trade

However, the Court need not reach whether the TREAD or Safety Act provide sufficient basis for a FDUTPA claim, as the vast majority of Plaintiff's allegations supporting her FDUTPA claim do not involve conduct regulated by TREAD.[5]

Second, Ford argues that there is no private right of action for a violation of the TREAD Act or the Safety Act. This argument appears to be a non-starter, as there is nothing in Plaintiff's FDUTPA claim that necessitates a finding that the TREAD Act provides a private cause of action. Ford's position on this point also includes an implied preemption argument, which was thoroughly explored and rejected by this Court in *Rosen. See Rosen et al. v. J.M. Auto et al.*, case no. 07–cv–61234–WPD (March 6, 2008).

■ Third, Ford argues that the doctrine of primary jurisdiction demands dismissal of Plaintiff's FDUTPA claim. The primary jurisdiction doctrine applies where a plaintiff's claims implicate a federal agency's expertise for a regulated product. *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956) (primary jurisdiction doctrine applies "whenever enforcement of [a] claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body"). Here, Ford asserts that the Court should defer to the National Highway Traffic Safety Administration ("NHTSA"), who is NHTSA is "responsible for reducing deaths, injuries and economic losses resulting from motor vehicle crashes. This is accomplished by setting

and enforcing safety performance standards for motor vehicles and motor vehicle equipment ... NHTSA investigates safety defects in motor vehicles ... and provides consumer information on motor vehicle safety topics."[6] The NHTSA also has full administrative and regulatory authority to set and enforce disclosure obligations under the Safety Act, 49 U.S.C. § 30101 *et seq.*, applicable to motor vehicle manufacturers. Ford argues that if Plaintiff believes that Ford has violated any reporting obligations, she should provide this information to the NHTSA—the agency with primary jurisdiction.

■ Ford's primary jurisdiction argument fails. First, there is a heavy presumption against invoking primary jurisdiction, as the court has a "virtually unflagging obligation" to exercise jurisdiction. *See, e.g., Williams v. Ala. Dept. of Transp.*, 119 F.Supp.2d 1249 (M.D.Ala.2000) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 19, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)). Additionally, Ford's argument of deferral to NHTSA because Plaintiff's claims implicate vehicle safety issues has been offered and rejected. Regarding whether the Court should defer to the primary jurisdiction of the NHTSA, this Court agrees with the reasoning articulated by the district court in *Kent v. DaimlerChrysler Corp.*, 200 F.Supp.2d 1208 (N.D.Cal.2002):

Here, the Court does not find that exercise of the doctrine of primary jurisdiction is necessary at this stage of the

---

practices do not fall within scope of FDUTPA).

**5.** Moreover, the Court notes, violations of TREAD have served as a predicate for a claim under a state consumer protection statute. *See In re Toyota Motor Corp.*, 754 F.Supp.2d 1145, 1181 (C.D.Cal.2010).

**6.** *See* NHTSA, Who We Are and What We Do, available at http://www.nhtsa.gov/About+NHTSA/Who+We+Are+What+We+Do (last visited June 23, 2014).

case, either to ensure uniformity of regulation or because NHTSA is better-equipped than the Court to address the issues raised by Plaintiffs' claims. First, because Plaintiff does not challenge a safety standard or any NHTSA regulation, and because Defendant has not identified any specific conflict between this action and the on-going NHTSA investigation of the same problem, the need for "uniformity and consistency in the regulation of business" does not justify application of the doctrine of primary jurisdiction at this time. *See Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 304, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976) (holding that consideration of uniformity did not justify invoking primary jurisdiction doctrine where plaintiff did not challenge any regulation or practice of the agency). Second, the Court does not find that Plaintiffs' claims raise "issues of fact not within the conventional experience of judges." *See Far East Conference v. United States*, 342 U.S. 570, 574, 72 S.Ct. 492, 96 L.Ed. 576 (1952) (holding that claims had to be brought before agency before court could consider them because their resolution required "a high degree of expert and technical knowledge" and the agency therefore would be better able to deal with these issues). Rather, the state law claims brought by Plaintiffs are "within the conventional competence of the courts." *See Nader*, 426 U.S. at 305, 96 S.Ct. 1978. Therefore, based on the record that is currently before this Court, the Court does not find that the issues raised by Plaintiffs in this action need be addressed by NHTSA before this Court can consider them.

200 F.Supp.2d at 1218–19.

██ Finally, the Court is unpersuaded by Ford's argument that the FDUTPA claim should be dismissed because Plaintiff fails to allege sufficient supporting facts to meet the pleading requirements of *Twombly* and *Iqbal*. Ford claims that Plaintiff makes sweeping and generalized allegations of deceptive and unfair conduct, and/or that Plaintiff has pled a shotgun pleading. Apart from criticizing the language in ¶ 85 of the Complaint, that refers to "Ford's generalized course of wrongdoing and/or deception," Ford does not set forth any particular arguments about how the factual allegations supporting this count fail the *Twombly/Iqbal* standards. The Court finds Plaintiff's claim to be sufficiently pled. Further, to the extent that Ford takes the position that Fed.R.Civ.P. 9(b) applies to Plaintiff's FDUTPA claim, the Court disagrees. While the Court acknowledges that courts within this district have reached various conclusions about the application of Rule 9(b) to FDUTPA claims, this Court is persuaded that Rule 9(b) does not apply to FDUTPA claims. *See Toback v. GNC Holdings, Inc.*, 2013 WL 5206103, *2 (S.D.Fla. Sept. 13, 2013).

Based upon the foregoing, Ford's motion to dismiss Plaintiff's FDUTPA claim (Count II) shall be denied.

### III. *CONCLUSION*

Based upon the foregoing, it is **ORDERED AND ADJUDGED** as follows:

1. Ford's Motion to Dismiss [DE 19] is **DENIED**;

2. Ford shall file its Answer within ten (14) days.